2021 IL 125434

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 125434)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v.
CORDELL BASS, Appellee.

*Opinion filed April 15, 2021.*


JUSTICE GARMAN delivered the judgment of the court, with opinion.

Justices Theis, Michael J. Burke, Overstreet, and Carter concurred in the judgment and opinion.

Chief Justice Anne M. Burke concurred in part and dissented in part, with opinion.

Justice Neville concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1        During a routine traffic stop, officers ran a name check on defendant Cordell Bass, a passenger. The name check returned an investigative alert issued by the Chicago Police Department for an alleged sexual assault. Bass was arrested and subsequently made incriminating statements to investigators. Prior to trial, Bass sought to suppress those statements. The trial court denied the motion and found him guilty of criminal sexual assault in a bench trial. The appellate court reversed and remanded for a new trial, holding that the traffic stop violated the fourth amendment to the United States Constitution because it was unlawfully prolonged. It further held that article I, section 6, of the Illinois Constitution (Ill. Const. 1970, art. I, § 6) deviates in meaning from the fourth amendment to the United States Constitution (U.S. Const., amend. IV), that it provides greater protections than the fourth amendment, and that arrests based on investigative alerts, even those supported by probable cause, violate the Illinois Constitution. We allowed the State's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Oct. 1, 2019). We also allowed the City of Chicago to file an *amicus* brief.

¶ 2                                    BACKGROUND

¶ 3        "Investigative alerts," formerly known in Illinois as "stop orders," are entries in a police database of individuals that police are attempting to locate. Running a name check through this database will reveal any investigative alerts issued for that person by the department, including other information such as the facts relied on for issuing the alert. There are two types of investigative alerts: one that asserts probable cause for an arrest and one that does not.

¶ 4        On July 31, 2014, the Chicago Police Department issued an investigative alert for Cordell Bass alleging, effectively, that there was probable cause to arrest him for sexual assault. Police issued the investigative alert after interviewing the victim and a second witness and after both had identified Bass as the perpetrator from a photo array.

¶ 5        About two weeks later, sometime between 1 and 2 a.m. on August 13, 2014, officers pulled over a minivan for running a red light. Bass was one of several passengers. The order of events is not entirely clear, but at some point during the

traffic stop, officers ordered the occupants out of the vehicle, ran a name check on some of them, and discovered the investigative alert issued for Bass. On the basis of that investigative alert, the officers arrested Bass. The officers also completed other administrative tasks related to the red light violation during the stop. They ultimately terminated the traffic stop by giving the driver a verbal warning. The officers testified that the stop lasted about eight minutes.

¶ 6   Shortly after his arrest, Bass gave incriminating statements to investigators. Prior to trial, he moved to suppress those statements on two grounds: First, in conducting the traffic stop, "the Chicago police exceeded their authority, detained those people beyond what a traffic stop for a ticket would be and then started to question or obtain information from Mr. Bass." Second, he argued that the police "did not have an arrest warrant for Mr. Bass." Instead, officers relied on the investigative alert, which allowed them to "avoid constitutional protections and the court procedures" in not seeking an arrest warrant. He reiterated that "this was an illegal arrest of Mr. Bass for the second reasons because they did not get an arrest warrant and that they should have followed the correct procedure when they had ample amount of days to do so." Defendant argued that these actions violated the fourth amendment to the United States Constitution (U.S. Const., amend. IV) as well as article I, section 6, of the Illinois Constitution (Ill. Const. 1970, art. I, § 6). In doing so, he consistently equated the two constitutions and made no distinction between them. The Cook County circuit court denied the motion to suppress, finding that the arrest was supported by probable cause and that running the name check "was proper." The matter proceeded to a bench trial, where Bass was convicted of criminal sexual assault.

¶ 7   On appeal, Bass challenged the sufficiency of the evidence, various monetary assessments, and the denial of his motion to suppress. 2019 IL App (1st) 160640. Relevant here, Bass argued that his motion to suppress should have been granted because (1) the officers unlawfully extended the duration of the stop when they conducted a name check on Bass and (2) an investigative alert, standing alone, cannot justify a warrantless arrest. *Id.* ¶ 28. On the first issue, Bass made no mention of the Illinois Constitution, resting exclusively on fourth amendment grounds, although he did cite Illinois caselaw applying those principles in his argument. *Id.* ¶¶ 72-78. On the second issue, he expressly invoked both the United States and

Illinois Constitutions' provisions on warrants, but he again equated the two constitutions, making no distinction between them. *Id.* ¶¶ 35-50.

¶ 8        At oral argument, the entirety of the discussion on both issues revolved around the fourth amendment. Two months later, the appellate court ordered supplemental briefing on the question of whether investigative alerts violate the Illinois Constitution specifically. Bass first observed that Illinois search and seizure jurisprudence is in "limited lockstep" with that of the United States Supreme Court's fourth amendment jurisprudence, meaning that the two provisions are generally read alike. Even though investigative alerts have not yet been found unconstitutional under either constitution, he argued, investigative alerts nevertheless violate both. Even if investigative alerts are not prohibited by the United States Constitution, he continued, they should still be prohibited by the Illinois Constitution because, under a limited lockstep analysis, Illinois may deviate from federal precedent when interpreting a similar provision in its own constitution where the text, history, and tradition of the Illinois Constitution suggest such a deviation. He argued that the appellate court should deviate from federal precedent in this case because (1) investigative alerts do not qualify as exigent circumstances and (2) investigative alerts violate the privacy provision of article I, section 6.

¶ 9        The appellate court ultimately reversed Bass's conviction and remanded for a new trial. *Id.* ¶¶ 85, 97. After determining that the evidence was sufficient to convict, the appellate court summarily concluded that investigative alerts do not violate the fourth amendment. *Id.* ¶ 37. It then engaged in a lengthy analysis of investigative alerts; lockstep doctrine; and the text, history, and tradition of the Illinois Constitution. *Id.* ¶¶ 38-70. It concluded (1) that article I, section 6, of the Illinois Constitution differs in meaning from the fourth amendment; (2) that article I, section 6, of the Illinois Constitution affords greater protections than those of the fourth amendment; and (3) that arrests based solely on investigative alerts, even those supported by probable cause, are unconstitutional under the Illinois Constitution. *Id.* ¶ 71; see Ill. Const. 1970, art. I, § 6. "For the sake of completeness," it then asked whether the traffic stop was unlawfully extended by running the name check on Bass. 2019 IL App (1st) 160640, ¶ 73. It easily found that the State did not carry its burden on this front. *Id.* ¶ 78. Finally, the appellate court addressed the proper remedy and double jeopardy concerns, ultimately

concluding that a new trial was the proper remedy for the erroneous denial of Bass's motion to suppress. *Id.* ¶¶ 79-85.

¶ 10 Justice Mason concurred that Bass's conviction should be reversed because the State did not carry its burden in showing the legality of the stop but disagreed with the majority's decision to reverse Bass's conviction on a constitutional issue of first impression that it raised *sua sponte*, postargument. *Id.* ¶ 109 (Mason, J., concurring in part and dissenting in part). Justice Coghlan, who replaced Justice Mason upon Mason's retirement, adopted this concurrence *in haec verba* upon the appellate court's denial of rehearing. *Id.* ¶ 126 (Coghlan, J., dissenting upon denial of rehearing).

¶ 11 The State now appeals.

¶ 12 ANALYSIS

¶ 13 The State argues before this court that the stop was lawfully executed and, even if it were not, the appellate court erred by going beyond that narrow issue to address an unbriefed, unraised, and unnecessary issue of constitutional magnitude. In the alternative, the State argues that investigative alerts are constitutional under both the United States and Illinois Constitutions. It also argues for the application of the good-faith exception to the exclusionary rule in the event we hold investigatory alerts unconstitutional. Bass maintains that the stop was unlawfully extended by running a name check on him because it was unrelated to the mission of resolving a red light violation and added time to the stop. He argues that he properly raised the issue that investigatory alerts are *de facto* unconstitutional under article I, section 6, of the Illinois Constitution and that, even if he did not, the appellate court properly addressed those issues.

¶ 14 The Traffic Stop

¶ 15 The fourth amendment prohibits unreasonable seizures. U.S. Const., amend. IV. A traffic stop is a seizure of both the driver and the passengers, analogous to a so-called *Terry* stop. *Brendlin v. California*, 551 U.S. 249, 251 (2007); *Rodriguez v. United States*, 575 U.S. 348, 354 (2015); see *Terry v. Ohio*, 392 U.S. 1 (1968).

- 5 -

Determining the reasonableness of a *Terry* stop involves a dual inquiry: "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19-20.

¶ 16    Bass concedes that the initial stop was lawful but disputes whether the officers' actions were within the scope of the stop's initial purpose. The focus of the scope inquiry is on the duration of the stop. *People v. Harris*, 228 Ill. 2d 222, 242-44 (2008). A lawfully initiated traffic stop may violate the fourth amendment if it is prolonged beyond the time reasonably required to complete its mission and attend to related safety concerns. *Rodriguez*, 575 U.S. at 354 (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).

¶ 17    The "mission" of a traffic stop is to address the traffic violation that warranted the stop, and authority for the stop ends when tasks related to the stop's purpose are, or reasonably should have been, completed. *Id.* at 353-54. Ordinary inquiries related to traffic stops include checking the driver's license, doing a warrant check on the driver, or asking for registration and proof of insurance. *Id.* at 355-56. Asking a passenger for identification during a traffic stop does not by itself violate the fourth amendment. *Harris*, 228 Ill. 2d at 245-49 (citing *Muehler v. Mena*, 544 U.S. 93 (2005)). Nor does the voluntary relinquishment of a physical form of identification, such as a driver's license. *Id.* (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)).

¶ 18    The Supreme Court has made plain that an officer's inquiries into matters unrelated to the justification of the traffic stop do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop. *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (citing *Muehler*, 544 U.S. at 100-01 (finding the seizure was not unreasonable where officers questioned a detainee about her immigration status during the detention because the detention was not prolonged by the questioning)). Likewise, certain unrelated investigations during an otherwise lawful traffic stop are permitted, but not in a way that prolongs the stop. *Rodriguez*, 575 U.S. at 354-55, 357. This court has further held that a warrant check on the occupants of a lawfully stopped vehicle does not violate the fourth amendment so long as the duration of

the stop is not unnecessarily prolonged for the purpose of conducting the check and the stop is otherwise executed in a reasonable manner. *Harris*, 228 Ill. 2d at 237.

¶ 19    Officers may also attend to safety concerns relevant to the stop's mission, although the officers' safety interest stems from the mission of the stop itself. *Rodriguez*, 575 U.S. at 356. On-scene investigations into other crimes—and taking safety precautions to facilitate these extraneous investigations—detours from that mission. *Id.* at 356-57.

¶ 20    However, officers cannot lawfully pursue unrelated investigations after quickly completing the mission by claiming that the overall duration of the stop remained reasonable, nor by waiting to resolve the mission (such as by writing a ticket or giving a verbal warning) until unrelated inquiries are completed. *Id.* at 357. The critical question is not the order in which events occur but, rather, whether the stop is prolonged beyond the point at which the original mission should have been completed. *Id.* Anything beyond that point "adds time" to the stop. *Id.*

¶ 21    With these settled fourth amendment rules in mind, we turn to the motion to suppress. Whether the trial court erred in denying the motion to suppress evidence is subject to a two-part standard of review: the trial court's findings of historical fact are reviewed for clear error and may be rejected only if they are against the manifest weight of the evidence, but the trial court's ultimate ruling as to whether suppression is warranted is reviewed *de novo*. *Harris*, 228 Ill. 2d at 230. On a motion to suppress, the defendant bears the burden of establishing a *prima facie* case that the evidence at issue was obtained by an illegal seizure. *People v. Gipson*, 203 Ill. 2d 298, 306-07 (2003). Once the defendant makes out a *prima facie* case that a seizure was unreasonable, the burden shifts to the State to come forward with evidence to rebut. *Id.* at 307. Although the ultimate burden of proof remains with the defendant (725 ILCS 5/114-12(b) (West 2014)), the State here repeatedly conceded that it bore the burden of showing that the stop was lawful.

¶ 22    Here, Bass made out a *prima facie* case that the stop was unconstitutional because his name check had nothing to do with resolving the red light violation at issue nor with its safe execution. Instead, the officers resolved the traffic violation and then waited to issue the verbal warning so that they could engage in on-scene investigations into other crimes, specifically by checking names until they found something worth investigating.

¶ 23    To rebut Bass's *prima facie* case, the State offered the testimony of the two arresting officers. According to them, they observed a red minivan disregard a red light sometime between 1 and 2 a.m., whereupon they initiated the traffic stop. As Officer Carrero approached the driver, Officer Serrano approached the passenger side. The rear windows of the minivan were tinted, and the officers could not see into the back of the vehicle. Officer Carrero advised the driver of the reason for the stop and asked for the driver's license. Officer Carrero could not remember whether the driver produced his license, but he did ask the driver to get out of the car, which is his usual practice when a driver fails to provide a license. Seeing his partner ask the driver out of the vehicle, and citing safety concerns, Officer Serrano asked the other passengers out of the vehicle as well. Officer Carrero testified that, besides the driver and Bass, there were "probably four to five, maybe six" other passengers in the minivan.

¶ 24    At this point, the evidence—characterized by the State itself as "sparse"—is insufficient to answer whether the traffic stop was extended by unrelated inquiries into Bass's records. It is not clear from the record how long the stop lasted. Bass asserts in his written motion to suppress that the stop was initiated "at or about" 1:07 a.m. The officers testified at the suppression hearing that the stop lasted about eight minutes, and that testimony was not rebutted. The State argued at the close of the hearing that the stop lasted less than 10 minutes. The arrest report, however, lists the arrest at 1:41 a.m. Before this court, Bass accepted the State's version of the facts, and we therefore do likewise. But even if the stop lasted only eight minutes, it is impossible from the evidence presented by the State to account for the time spent during the stop and thus carry its burden.

¶ 25    At some point during the stop, Officer Carrero ran a Law Enforcement Agencies Data System (LEADS) check on the driver. Officer Carrero also completed a "TSS card," which documents the driver's information, the vehicle's information, the reason for the stop, and whether the vehicle was searched. At some point, Bass gave Officer Serrano his driver's license. At some other point, Officer Carrero ran some, but not all, of the names of the passengers. The record does not reveal whether Officer Serrano conducted any name checks, which officer actually ran the name check on Bass, or in what order the name checks occurred. Nor can we discern in what order these events (the TSS card, the LEADS check, and the name checks) were completed, although Officer Carrero testified that the verbal warning "would

- 8 -

have came last." However, the State could not say, based on the record, whether Bass was arrested before or after the verbal warning, nor when precisely the probable cause to arrest Bass arose, temporally speaking.

¶ 26    It is clear from this record that the mission of the stop was to resolve a red light violation. Completing the TSS card and LEADS check were related to that mission. Asking the driver and passengers out of the vehicle were permissible as *de minimis* safety precautions related to resolving that mission. Asking Bass for identification and obtaining his driver's license were not inherently improper, but it is unclear from the record if those two actions, and the subsequent name checks of the passengers, were related to resolving the red light violation or were part of a detouring investigation, which prolonged the stop. The State has not met its burden in producing evidence sufficient to make a determination on this issue. We therefore conclude, as did the entirety of the appellate panel, that the stop was unreasonably extended and the motion to suppress should have been granted.

¶ 27    In light of this holding, Bass asks us to affirm the appellate court's decision to reverse and remand for a new trial. We agree with the appellate court that the proper remedy for this constitutional violation is a new trial because the error here was not harmless. 2019 IL App (1st) 160640, ¶¶ 80-83. Likewise, we agree that no double jeopardy concerns are present given that the evidence was sufficient to convict. *Id.* ¶¶ 22-26, 84. Neither party challenges these holdings here. For these reasons, we affirm the appellate court's decision to reverse Bass's conviction and remand for a new trial.

¶ 28                          Other Constitutional Arguments

¶ 29    Having disposed of the case on these narrow grounds, we end our analysis here. Courts of review will not decide moot or abstract questions, will not review cases merely to establish precedent, and will not render advisory opinions. *Peach v. McGovern*, 2019 IL 123156, ¶ 64. Nor do courts in Illinois consider issues where the result will not be affected regardless of how those issues are decided. *Id.*; *In re Alfred H.H.*, 233 Ill. 2d 345, 351 (2009).

¶ 30    Likewise, this court's long-standing rule is that cases should be decided on nonconstitutional grounds whenever possible, reaching constitutional issues only

as a last resort. *In re E.H.*, 224 Ill. 2d 172, 178 (2006) (citing cases back to 1910). Consequently, courts must avoid reaching constitutional issues unless necessary to decide a case. *Id.*; *People v. Hampton*, 225 Ill. 2d 238, 244 (2007).

¶ 31     We do not express any opinion on limited lockstep analysis, its application to warrants or investigatory alerts, or the constitutionality of investigative alerts. Those portions of the appellate opinion dealing with these issues are vacated.

¶ 32                                    CONCLUSION

¶ 33     The State bore the burden of showing that the stop was not unlawfully prolonged. Because it failed to meet that burden, we hold that the traffic stop here violated the fourth amendment and the motion to suppress should have been granted. We therefore affirm the reversal of Bass's conviction and remand for a new trial. Having disposed of the case on these narrow grounds, we vacate those portions of the appellate opinion related to limited lockstep analysis and investigatory alerts.

¶ 34     Appellate court judgment affirmed in part and vacated in part.

¶ 35     Circuit court judgment reversed.

¶ 36     Cause remanded.

¶ 37     CHIEF JUSTICE ANNE M. BURKE, concurring in part and dissenting in part:

¶ 38     I agree with the majority that the traffic stop in which defendant was involved was unlawfully extended in violation of the fourth amendment, that the circuit court erred in denying defendant's motion to suppress, and that defendant's conviction must therefore be reversed. I disagree, however, with the majority's decision to vacate the appellate court's holding that defendant's arrest violated article I, section 6, of the Illinois Constitution of 1970. The majority offers no legally valid justification for taking this step. Accordingly, I specially concur in part and dissent in part.

¶ 39     Defendant was a passenger in a vehicle stopped by Chicago police officers for a traffic violation. The driver could not produce a license. As a result, the driver, as well as defendant and other passengers, was asked to exit the vehicle and provide identification. The police officers then ran a name check on everyone, which revealed that there was a Chicago Police Department "investigative alert with probable cause" to arrest defendant for criminal sexual assault. Based solely on this alert, defendant was arrested and charged with criminal sexual assault. Prior to trial, defendant moved to suppress certain incriminating statements he had made following his arrest. That motion was denied, and defendant was convicted of criminal sexual assault.

¶ 40     On appeal, the appellate court held that the trial court erred in denying defendant's motion to suppress and that this error required the reversal of defendant's conviction and a new trial. The appellate court provided two alternative grounds for finding that the motion to suppress should have been granted, both of which centered on the legality of defendant's arrest. First, the appellate court held that under article I, section 6, of the Illinois Constitution of 1970, a finding of probable cause to arrest must be based, "not only on a minimum threshold of sufficient facts, but sufficient facts presented in proper form (a sworn affidavit) to the appropriate person (a neutral magistrate)." 2019 IL App (1st) 160640, ¶ 62. This standard was not met here, according to the appellate court, because defendant's warrantless arrest was based solely on an investigative alert issued by the Chicago Police Department. The appellate court therefore held that defendant's arrest violated article I, section 6, and his postarrest statements should have been suppressed as the fruit of the poisonous tree.

¶ 41     Second, the appellate court held that, even if defendant's arrest could properly be based on the investigative alert, the arrest was nevertheless unconstitutional because it occurred only after the traffic stop had been unlawfully extended in violation of the fourth amendment. On this ground, too, the appellate court concluded that defendant's postarrest statements should have been suppressed. Thus, the appellate court provided two alternative, constitutional grounds for finding defendant's arrest illegal, each of which provided an independent basis for suppressing defendant's postarrest statements and reversing defendant's conviction.

¶ 42　　The majority affirms the judgment of the appellate court reversing defendant's conviction. However, the majority does so only on the ground that defendant's arrest was unconstitutional because the traffic stop was unlawfully extended in violation of the fourth amendment. The majority does not address whether defendant's arrest violated article I, section 6. The majority gives the following explanation as to why this issue is not addressed:

> "Courts of review will not decide moot or abstract questions, will not review cases merely to establish precedent, and will not render advisory opinions. *Peach v. McGovern*, 2019 IL 123156, ¶ 64. Nor do courts in Illinois consider issues where the result will not be affected regardless of how those issues are decided. *Id.*; *In re Alfred H.H.*, 233 Ill. 2d 345, 351 (2009).

> Likewise, this court's long-standing rule is that cases should be decided on nonconstitutional grounds whenever possible, reaching constitutional issues only as a last resort. *In re E.H.*, 224 Ill. 2d 172, 178 (2006) (citing cases back to 1910). Consequently, courts must avoid reaching constitutional issues unless necessary to decide a case. *Id.*; *People v. Hampton*, 225 Ill. 2d 238, 244 (2007)." *Supra* ¶¶ 29-30.

¶ 43　　Having provided this explanation, the majority then holds that the portion of the appellate court opinion that addressed the legality of defendant's arrest under the Illinois Constitution must be vacated. The majority states:

> "We do not express any opinion on limited lockstep analysis, its application to warrants or investigatory alerts, or the constitutionality of investigative alerts. Those portions of the appellate opinion dealing with these issues are vacated." *Supra* ¶ 31.

¶ 44　　Notably, the majority does not state what rule the appellate court violated that requires vacating a portion of that court's opinion. We are left, therefore, to infer that the reasons given by the majority for not addressing whether defendant's arrest violated the Illinois Constitution must also be the same reasons that require vacating that portion of the appellate court opinion that addressed the issue. In other words, according to the majority, the appellate court opinion must be vacated in part because it rendered an improper advisory opinion and improperly reached a

constitutional issue when there was a nonconstitutional basis for supporting its judgment. The problem, however, is that neither of these things is true.

¶ 45        First, it is well settled that when a reviewing court provides two fully developed, alternative holdings, each of which is sufficient to support the judgment, neither holding is advisory or *dictum* or, in some sense, improper. See, *e.g.*, *Woods v. Interstate Realty Co.*, 337 U.S. 535, 537 (1949) ("where a decision rests on two or more grounds, none can be relegated to the category of *obiter dictum*"); *United States v. Title Insurance & Trust Co.*, 265 U.S. 472, 486 (1924); *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 236 (2010); 21 C.J.S. *Courts* § 229 (2006). Of course, there may be instances where the resolution of one issue substantively precludes resolution of the other. If, for example, a reviewing court determines it lacks jurisdiction, "any further discussion of the merits is dictum." 21 C.J.S. *Courts* § 227, at 225 (2006). However, as a general rule, there is no reason why a reviewing court may not provide more than one holding in support of its judgment and it is not reversible error for a court to do so. Accordingly, the fact that the appellate court provided alternative holdings in support of its judgment in this case is not a basis for vacating a portion of its opinion. See also, *e.g.*, Aaron-Andrew P. Bruhl, *The Remand Power and the Supreme Court's Role*, 96 Notre Dame L. Rev. 171, 205 (2020) ("Including alternative holdings in the same opinion does not create an advisory opinion."); Girardeau A. Spann, *Advisory Adjudication*, 86 Tul. L. Rev. 1289, 1297 (2012) ("alternative holdings adjudicated by lower courts are not typically viewed as impermissible advisory opinions").

¶ 46        The majority also cites the rule holding that "cases should be decided on nonconstitutional grounds whenever possible, reaching constitutional issues only as a last resort." *In re E.H.*, 224 Ill. 2d 172, 178 (2006); *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring, joined by Stone, Roberts, and Cardozo, JJ.) ("[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law," a court must "decide only the latter"). The difficulty here is that both the grounds relied upon by the appellate court in this case were constitutional. The majority has not pointed to any nonconstitutional issue or ruling that the appellate court overlooked or on which its judgment could rest. Accordingly, it cannot be said that the appellate court committed reversible error because the court failed to resolve the case on a nonconstitutional ground.

¶ 47     Neither of the reasons offered by the majority for vacating the appellate court opinion in part is correct. The majority thus vacates a portion of the appellate court opinion without providing any valid, legal basis for doing so. I therefore respectfully dissent in part.

¶ 48     JUSTICE NEVILLE, concurring in part and dissenting in part:

¶ 49     I agree with the majority and Chief Justice Burke that the trial court erred in denying defendant's motion to suppress because the traffic stop in which defendant was a passenger was unlawfully extended in violation of the fourth amendment. Consequently, for that reason, I specially concur in the majority's affirmance of the appellate court's decision to reverse defendant's conviction and remand for a new trial. *Supra* ¶¶ 15-27.

¶ 50     However, I disagree with the majority's use of constitutional avoidance to vacate the appellate court's holding that defendant's arrest was unconstitutional under the warrant clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 6). *Supra* ¶¶ 29-31. I believe that principles of constitutional avoidance are flexible and require the prudential exercise of discretion. Further, I believe that the State's use of an investigative alert to justify defendant's warrantless arrest merits constitutional scrutiny. Accordingly, I respectfully dissent from that part of the majority opinion that vacates the appellate court's analysis and holding under the Illinois Constitution.

¶ 51     Defendant was a vehicle passenger during a routine traffic stop. Police officers ran a name check on defendant. The name check disclosed an "investigative alert" that summarized a reported criminal sexual assault and stated that there was probable cause to arrest defendant. Based on the investigative alert, defendant was arrested. After his arrest, defendant gave an inculpatory statement and was charged by information with one count of criminal sexual assault. At the close of a hearing, the trial court denied defendant's motion to quash arrest and suppress statements. At the close of defendant's bench trial, he was convicted and sentenced to eight years' imprisonment.

¶ 52     Before the appellate court, defendant challenged, *inter alia*, the denial of his motion to suppress. Defendant argued that (1) running a name check on him, a

passenger, unreasonably prolonged the traffic stop for reasons unrelated to its initial purpose and (2) even if the traffic stop did not violate the fourth amendment, the investigative alert, standing alone, cannot justify a warrantless arrest. 2019 IL App (1st) 160640, ¶ 28. The appellate court agreed with both arguments. *Id.*

¶ 53    The appellate court held that the State failed to carry its burden of proving that the name check did not unlawfully extend the duration of the stop. *Id.* ¶¶ 72-78. Before this court, the majority correctly affirms the appellate court's holding that the traffic stop was invalid, reverses defendant's conviction, and remands for a new trial.

¶ 54    The appellate court also addressed defendant's challenge to the investigative alert, holding that the use of investigative alerts to support warrantless arrests violates the warrant clause of the Illinois Constitution, which provides: "No warrant shall issue without probable cause, supported by affidavit particularly describing the place to be searched and the persons or things to be seized." Ill. Const. 1970, art. I, § 6; 2019 IL App (1st) 160640, ¶¶ 30-71.

¶ 55    However, the majority vacates the appellate court's holding that the use of investigative alerts violates the Illinois Constitution. The majority characterizes the appellate court's state constitutional analysis and holding as "moot or abstract," "advisory," ineffective, and unnecessary. *Supra* ¶¶ 29-31. I respectfully disagree for the following reasons.

¶ 56    It is certainly the practice that courts should decide cases on nonconstitutional grounds whenever possible and, consequently, must avoid reaching constitutional issues unless necessary to decide a case. One rationale for this rule of last resort is that a court should not compromise the stability of the legal system by declaring legislation unconstitutional when a particular case does not require it. See, *e.g.*, *People v. Lee*, 214 Ill. 2d 476, 482 (2005); *People v. Cornelius*, 213 Ill. 2d 178, 189 (2004).

¶ 57    One scholar has articulated a rationale for the practice of constitutional avoidance based on separation of powers:

    "One way to partially escape the dilemma of judicial review is to minimize the number of occasions on which one encounters it, and this is where the

avoidance policy enters the picture. The last resort rule is a simple and easily understood tool. Given the value and the potential pitfalls of judicial review, it is hardly surprising that [a] Court would prefer to sidestep constitutional questions when it can do so at little or [no] cost. It stands to reason that fewer occasions of judicial intervention will produce fewer instances of judicial nullification of legislative and executive decisions. Fewer nullifications in turn will produce less friction between the branches. In this way, constitutional avoidance diminishes the worry that judicial activism may disrupt the balance between majority rule and constitutional norms." Michael L. Wells, *The "Order-of-Battle" in Constitutional Litigation*, 60 SMU L. Rev. 1539, 1550 (2007).

Similarly, Professor Kloppenberg rejects the argument that "courts offend the separation principle whenever they fail to address a constitutional issue. The primary constitutional responsibility of the \*\*\* courts is to resolve cases, not to reach constitutional issues." Lisa A. Kloppenberg, *Avoiding Constitutional Questions*, 35 B.C. L. Rev. 1003, 1054 (1994).

¶ 58        However, this rule of constitutional avoidance is not so rigid as to be absolute. As Professor Wells explains:

"Despite the benefits of constitutional avoidance, it is best characterized as a flexible norm, not an absolute requirement. The objection to unbending adherence to the last resort rule is that the benefits come at a price and the price will sometimes be too high. To see why, imagine an (admittedly unrealistic) regime in which [a] Court took the extreme view favoring avoidance in *all* cases. Unbridled avoidance would effectively abandon judicial review altogether and deny all relief to litigants with constitutional claims. No one proposes that. In its strongest form, the policy is that courts should avoid *unnecessary* constitutional decisions. \*\*\*

\* \* \*

But determining what is 'unnecessary' requires the exercise of judgment and the drawing of lines. Even in situations where a ruling on the constitutional issue is arguably unnecessary, constitutional avoidance produces costs as well as benefits, and the characterization of judicial intervention as 'unnecessary'

may depend on *how much* good will be accomplished by ruling on the matter rather than *whether* anything of value will be gained." (Emphases in original.) Wells, *supra*, at 1552.

¶ 59    Similarly, Professor Kloppenberg states: "Avoiding a constitutional issue through use of the last resort rule *** can undermine the courts' duty to be a counterweight to the more political branches when the Constitution so demands." Kloppenberg, *supra*, at 1054. She explains that a court's abstention from constitutional decisions allows the allegedly unconstitutional conduct to continue until checked. The last resort rule can thus function as an improper abdication of the courts' duty to act as a countermajoritarian force. Under this view, the function of courts generally is to be unpopular, to issue countermajoritarian decisions, and to do what a constitution requires despite political pressure. Although the majoritarian branches also have a duty to uphold the Constitution, courts are more insulated from political pressure and thus "are particularly designed for protecting the rights of minorities." *Id.* She concludes:

    "Circumstances may arise, however, where a court should reach the constitutionality of the action of other branches even if nonconstitutional grounds remain. For example, even if it required invalidating legislative or executive action, a court should reject the last resort rule if it demonstrated that non-majority rights could be redressed only by reaching the constitutional ground of decision in a particular case. In those circumstances, applying the last resort rule to avoid constitutional adjudication constitutes an abdication of *** courts' countermajoritarian responsibility." *Id.* at 1054-55.

¶ 60    These principles of constitutional review are grounded in prudential discretion. In this case, I believe that the appellate court correctly reached the constitutional issue of whether the use of investigative alerts by the Chicago Police Department is facially unconstitutional under the warrant clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 6).

¶ 61    The appellate court's analysis explains that investigative alerts are unique to the Chicago Police Department. 2019 IL App (1st) 160640, ¶ 33. Also, this panel of the First District of our appellate court has "strongly condemned" the practice of arrests based on investigative alerts. *Id.* ¶ 34. Further, interpreting the Illinois Constitution, the appellate court concluded:

- 17 -

"For the purposes of Bass's case, we find, with regard to the necessity of a warrant issued by a neutral magistrate, historical precedent concludes that article I, section 6, provides greater protections than the fourth amendment. Indeed, arrests based solely on investigative alerts, even those supported by probable cause, are unconstitutional under the Illinois Constitution." *Id.* ¶ 43.

The appellate court concluded its analysis as follows:

"We find that our constitution goes 'a step beyond' the United States Constitution and requires, in ordinary cases like Bass's, that a warrant issue before a valid arrest can be made. We hold an arrest unconstitutional when effectuated on the basis of an investigative alert issued by the Chicago Police Department." *Id.* ¶ 71.

Also, the First District is split on this issue, as reflected in the partial concurrence and partial dissent filed in the appellate court's decision. See *id.* ¶¶ 108-23 (Mason, J., concurring in part and dissenting in part).

¶ 62 Obviously, not reviewing the appellate court's state constitutional analysis of Bass's warrantless arrest allows this allegedly unconstitutional conduct to continue. Even worse, *vacating* the appellate court's analysis deprives the Chicago Police Department of crucial authoritative guidance on the procedures to follow under the Illinois Constitution when making warrantless arrests.

¶ 63 In conclusion, I would take judicial notice of the fact that the Chicago Police Department is already under a federal consent decree pertaining to its policies, practices, and procedures. See *Illinois v. City of Chicago*, No. 17-cv-6260, 2019 WL 398703 (N.D. Ill. Jan. 31, 2019). The use of investigative alerts has had a disparate impact on Chicago's African American and Latinx communities. Adam Mahoney, *Cook County to Appeal Ruling Finding Chicago Police Investigative Alerts Unconstitutional*, Chi. Reporter (July 26, 2019), https://www.chicago reporter.com/cook-county-to-appeal-ruling-finding-chicago-police-investigative-alerts-unconstitutional/ [https://perma.cc/Q8SF-BKAC] ("The Chicago Reporter has identified at least 11 settled lawsuits involving investigative alerts since 2011, mainly occurring on the South and West sides."). The police department's use of investigative alerts to justify warrantless arrests mandates that this policy, practice, and procedure be reviewed by the supreme court. Accordingly, I believe that

constitutional review is required to fulfill this court's role as the protector of the rights guaranteed by the warrant clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 6).

¶ 64　　　　I therefore respectfully concur in part and dissent in part.