2026 IL App (1st) 230041
No. 1-23-0041
Opinion filed May 15, 2026

Sixth Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 21 CR 12982 01 |
| | ) | |
| MICHAEL SANDERS, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Presiding Justice C.A. Walker and Justice Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1 Michael Sanders and three others were sitting on a house stoop on a Monday evening. Suddenly, three Chicago police squad cars pulled up. A lieutenant and four officers came toward them with flashlights. The lieutenant said they had received a call: "Somebody over here got a gun." Someone objected when the lieutenant opened the front gate, but the lieutenant did it anyway. He ordered Sanders to "step up" and frisked him. Having felt a gun, he directed another officer to frisk Sanders. That officer "cuffed [Sanders]" and "jangled his jeans," which caused the gun to fall along his pants leg.

¶ 2    Sanders was indicted for unlawful possession of a weapon by a felon. He moved to suppress, arguing the police found it during an illegal search. The trial court denied the motion.

¶ 3    After a stipulated bench trial, Sanders was found guilty. On appeal, he contends that the police lacked a reasonable, articulable suspicion that he was illegally armed when they stopped and frisked him. We agree. No facts justified the officers' *Terry* stop (see *Terry v. Ohio*, 392 U.S. 1 (1968)), and the motion should have been granted. Without that evidence, the State cannot prove Sanders possessed a gun. So we reverse.

¶ 4    Before proceeding, we observe that delays in the appeals of criminal cases carry consequences for defendants, their family and friends, and the people of Illinois, who incur the expense associated with incarceration. Sanders's arrest occurred in 2021, and his conviction and sentencing occurred in 2022. Today, in 2026, he has long been released from prison. Those years cannot be restored. Constitutional protections are meant to guard against that kind of loss. Cases that take a person's liberty should not take years to correct, especially when the sentence is a few years or less. The executive, legislative, and judicial branches must strive to find ways to minimize delays in the criminal justice system. In the words of Dr. King, "justice too long delayed is justice denied." Martin Luther King Jr., *Letter From Birmingham City Jail* 5 (American Friends Service Committee ed., 1963).

¶ 5                                    Background

¶ 6    A lieutenant received notice from the Office of Emergency Management Communications (OEMC) that someone had reported a man with a gun. Based on the information from an unknown caller, the police entered the front yard of a home where Michael Sanders and three others sat on

a stoop. Sanders, heavyset with long dreads and a blue shirt, matched the caller's description. Without observing weapons or asking any questions, they found a loaded Glock 21 on Sanders.

¶ 7    Sanders moved to suppress the gun as the fruit of an illegal search under *Terry v. Ohio*, 392 U.S. 1 (1968) (permitting frisk when officer reasonably suspects person is armed and dangerous as long as investigatory stop is lawful). At a hearing, the arresting officer testified, and the parties presented body-cam footage from two officers and home-surveillance footage.

¶ 8    Officer Alex Gray testified that he and others acted as back-up for their lieutenant, who received notice of an OEMC call at some unknown time. Gray first testified that the caller reported: "*[P]eople* with guns: one heavyset male with a blue shirt and long dreads and then one dark-complected and another with a caramel complexion." (Emphasis added) But in body-cam footage, which the State submitted as People's exhibit 2, Gray describes looking for one person: "Heavyset male with blue shirt, with dreads. And is said to have a gun on his side."

¶ 9    On cross-examination, the State refreshed Gray's memory with the report he wrote on the night of the arrest (People's exhibit 1). In it, Gray describes the OEMC call as a "dispatch of *a person* with a gun *** in that a heavyset male with a blue shirt with dreads had a gun outside in front and gangway." (Emphasis added.) After refreshing his memory with this report, Gray contradicted his testimony on direct examination and changed course once more in response to follow-up questions.

> "[STATE]: Take a look at this report and let me know when your memory has been refreshed.
>
> [GRAY]: So it was 7406 South Sangamon where we responded to *a person* with a gun.

[STATE]: And the description that you were given prior to arriving at 7406 South Sangamon was *individuals* with guns, correct?

[GRAY]: Yes.

[STATE]: One of them—

THE COURT: You said '*people* with guns'?

[STATE]: *People* with guns?

[GRAY]: Yes." (Emphases added.)

¶ 10    Gray testified that three squad cars arrived carrying the lieutenant, three other officers, and him. Four men were sitting on a stoop. The lieutenant approached first, opening the front gate over one of the men's objections. Home-surveillance footage depicts the lieutenant announcing, "We got a call somebody over here got a gun." The lieutenant said he would be "check[ing]" them all but walked directly to Sanders.

¶ 11    The lieutenant frisked Sanders without asking any questions. Sanders did not appear to have a gun, Gray testified. But his lieutenant reported feeling one during the frisk and ordered Gray to frisk Sanders, too. Gray "cuffed him up," "jangled his jeans," and "recovered the [gun] from the bottom opening of his [pants leg]."

¶ 12    Gray also watched as Officer B.J. Jansen cuffed and frisked the man sitting across from Sanders, who had a gun. Gray did not see a gun on the man before the frisk. The trial court received as evidence Officers Jansen's and Gray's body-cam footage. In Jansen's footage, he announces: "Nobody got a gun? Somebody said that somebody's got a gun over here, man. That's why we're here. We're not bullshitting you."

¶ 13     One of the two men sitting at the top of the stoop explained to the officers that he lived there. After his frisks, Sander responded to officers' questions that he did not have a Firearm Owners Identification (FOID) card or a concealed-carry license.

¶ 14     The State argued the trial court should deny Sanders's motion because (i) as a guest at someone's home, he lacked standing to challenge the search and (ii) "specific information" in the call justified both the stop and the frisk. In response, Sanders contended that the officers "did not even have enough [information] for a *Terry* stop," let alone the subsequent frisk.

¶ 15     The trial court denied Sanders's motion, finding in part that "[t]here's plenty for a stop, to at least do a pat-down search based on the information that the officers had." The court had heard Officer Gray's testimony and, "more importantly," had "observed the videos."

> "This encounter was under 90 seconds, tops. They got a call, a pretty specific call, went to a specific address, people with guns, that raises a level of concern for a police officer in the city. They encountered the two defendants here *** and after the pat-down, there was guns recovered right away. And then within those 90 seconds, they were questioned as to whether or not they had a CCL or a FOID and neither of them had it.
>
> So I don't find there's any sort of initial seizure. There's plenty for a stop, to at least do a pat-down search based on the information that the officers had. In a certain sense, I mean—I would say that the officers would be faulted if they didn't proceed the way they did, so your motion to suppress evidence is denied."

¶ 16     The trial court later denied Sanders's motion to reconsider.

¶ 17      Sanders chose a stipulated bench trial. Among other things, the parties agreed that Sanders had a prior felony conviction. The trial court found Sanders guilty of unlawful possession of a

- 5 -

weapon by a felon and sentenced him to two years in prison. See 720 ILCS 5/24-1.1(a) (West 2020).

¶ 18                                    Analysis

¶ 19    Sanders contends (i) officers stopped him despite observing him doing nothing illegal (ii) then frisked him based on an unreliable tip. The State disputes both contentions. The State also argues (i) Sanders lacks "standing" under the fourth amendment (U.S. Const., amend. IV) to raise this challenge and (ii) the officers acted reasonably as community caretakers.

¶ 20                           *Searches and Seizures*

¶ 21    Both the fourth amendment to the United States Constitution and article I, section 6, of the Illinois Constitution of 1970 guarantee the right to be free from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. The Illinois Supreme Court has interpreted the search-and-seizure provision found in article I, section 6, of the Illinois Constitution consistently with fourth amendment caselaw from the United States Supreme Court. *People v. Pitman*, 211 Ill. 2d 502, 513 (2004).

¶ 22    "Warrantless searches are generally considered unreasonable unless they fall within a few specific exceptions." *Id.* When assessing claims under these constitutional provisions, the touchstone is " 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' " *People v. Timmsen*, 2016 IL 118181, ¶ 9 (quoting *Terry*, 392 U.S. at 19).

¶ 23    This court defers to the trial court's factual findings unless they are against the manifest weight of the evidence. *People v. Lozano*, 2023 IL 128609, ¶ 29. We review *de novo* the ultimate question of whether the evidence should be suppressed. *People v. Colyar*, 2013 IL 111835, ¶ 24.

- 6 -

That is, we "remain[ ] free to engage in [our] own assessment of the facts in relation to the issues presented." *People v. Carter*, 2021 IL 125954, ¶ 21.

¶ 24                          *Reasonable Expectation of Privacy*

¶ 25     Before reaching the merits, we consider and reject the State's assertion that, "as a guest," Sanders lacked "standing" or a "reasonable expectation of privacy" to raise a claim under the fourth amendment.

¶ 26     Courts no longer refer to "standing" when analyzing fourth amendment claims. *People v. Johnson*, 237 Ill. 2d 81, 89 (2010). "Instead, the relevant inquiry is whether the person claiming the protections of the fourth amendment had a legitimate expectation of privacy in the place searched." *Id.* at 90.

¶ 27     The State errs by insisting that Sanders needed to "establish that he had any reasonable expectation of privacy as a guest on private property." As the State's citation of *Terry* makes clear, " 'the Fourth Amendment protects people.' " *Terry*, 392 U.S. at 9 (quoting *Katz v. United States*, 389 U.S. 347, 351 (1967)). And Sanders properly challenges the reasons why the officers specifically stopped and frisked him. *Id.*

¶ 28     Because Sanders does not challenge the search of another's property, the State's reliance on property-search cases has no bearing here. *E.g.*, *Minnesota v. Carter*, 525 U.S. 83, 90-91 (1998) (search of apartment used for a commercial purpose); *City of Champaign v. Torres*, 214 Ill. 2d 234, 245 (2005) (search of apartment); *Rakas v. Illinois*, 439 U.S. 128, 140-43 (1978) (search of vehicle); *Johnson*, 237 Ill. 2d at 89-90 (same).

¶ 29     The State offers no reason for us to depart from the federal and state constitutions' protections of Sanders's "right *** to be secure in [his] person[ ]." U.S. Const., amend. IV; Ill.

Const. 1970, art. I, § 6. Accordingly, we find that Sanders retained a reasonable expectation of privacy in his own person when visiting another's home.

¶ 30                                    *Community Caretaking*

¶ 31    The State next contends the officers acted reasonably as community caretakers in stopping and frisking Sanders. We disagree.

¶ 32    Community caretaking is not an "open-ended license" to do as the police please. See *Caniglia v. Strom*, 593 U.S. 194, 199 (2021). True, the United States Supreme Court once held that a warrantless search of an impounded car for an unsecured firearm did not violate the fourth amendment. *Cady v. Dombrowski*, 413 U.S. 433, 448 (1973). In doing so, the Supreme Court recognized how

> "[l]ocal police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as *community caretaking functions*, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." (Emphasis added.) *Id.* at 441.

Indeed, the location of the search in *Cady* was an impounded car, not a person sitting on a front stoop. *Id.* at 446-48. The Supreme Court contrasted the search of the impounded car with a search of a car "parked adjacent to the dwelling place of the owner." *Id.*

¶ 33    This distinction, between cars towed under police control and cars parked at home, favors Sanders. See *Caniglia*, 593 U.S. at 199 ("What is reasonable for vehicles is different from what is reasonable for homes."). " 'No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person,

- 8 -

free from all restraint or interference of others, unless by clear and unquestionable authority of law.' " See *Terry*, 392 U.S. at 9 (quoting *Union Pacific Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891)). Sanders's expectation of privacy in his own person was at least as great as a person's expectation of privacy in their own home.

¶ 34    Generally, "community caretaking refers to a capacity in which the police act when they are performing some task unrelated to the investigation of crime." *People v. McDonough*, 239 Ill. 2d 260, 269 (2010) (discussing *People v. Luedemann*, 222 Ill. 2d 530, 544-46 (2006)). That may include "helping children find their parents, mediating noise disputes, responding to calls about missing persons or sick neighbors, or helping inebriates find their way home." *Id.*

¶ 35    The State's citation of a special concurrence in *Colyar* does not support its contention. In *Colyar*, as in *Cady*, the purported caretaking activity concerned a stopped car in a public place. *Colyar*, 2013 IL 111835, ¶ 76 (Thomas, J., specially concurring) ("Determining why a car is blocking the entrance to a business's parking lot would seem to be precisely the type of function we described *** as being within the type of duties that police officers perform unrelated to the investigation of crime.").

¶ 36    The State cites no case holding that the investigation of a call concerning a person with a gun, or people with guns, near a home constitutes community caretaking rather than the investigation of criminal activity. Applying that exception would contradict decades of caselaw.

¶ 37                                    *Stop and Frisk*

¶ 38    In *Terry*, the Supreme Court held that a police officer, under appropriate circumstances, could briefly detain a person for investigatory purposes and, if necessary for safety, conduct a limited protective search for weapons. *Terry*, 392 U.S. at 30. A brief stop and subsequent frisk for

weapons became "constitutionally permissible if two conditions are met." *Arizona v. Johnson*, 555 U.S. 323, 326 (2009).

¶ 39　"First, to conduct a lawful investigatory stop, the police officer must reasonably suspect that the person apprehended is committing or has committed a criminal offense." *Lozano*, 2023 IL 128609, ¶ 35 (citing *Johnson*, 555 U.S. at 326). "Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous." *Johnson*, 555 U.S. at 326-27.

¶ 40　At the suppression hearing, the trial court appeared to rule that the officers could permissibly frisk Sanders whether they had reason to stop him or not. The court found: "There's plenty for a stop, to at least do a pat-down search based on the information that the officers had." But frisks may occur only after an officer determines that reasonable, articulable facts support a finding that criminal activity is afoot, justifying the investigative detention. *Id.*; *Terry*, 392 U.S. at 30. The parties, however, do not commit this mistake on appeal.

¶ 41　　　　　　　　　　　　　　　i. Stop

¶ 42　To justify a stop, the State "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. In addition, a court must consider those facts from the perspective of a reasonable officer at the time the situation confronted him. *Lozano*, 2023 IL 128609, ¶ 35.

¶ 43　The parties agree that the officers conducted a *Terry* stop of Sanders immediately after leaving the squad cars when the lieutenant and four officers entered the front yard, confronted the four men sitting on the stoop, and ordered them to stand up. We agree. *E.g.*, *id.* ¶ 36 (finding

defendant seized when officer confronted him and ordered him to come down from apartment building's stairs). So what justified this stop?

¶ 44　Sanders contends the officers stopped him despite observing him doing nothing illegal. Nor did the officers "take any steps to suitably corroborate any information or suspicion that Sanders was involved in any criminal activity prior to stopping [him]." That is, the content of the OEMC call might have given the officers a hunch about criminal activity but not specific and articulable facts permitting a reasonable inference that, say, Sanders was illegally armed.

¶ 45　The State agrees that the content of the call described nothing illegal, noting "possession of a firearm is not necessarily a crime." Nonetheless, the State contends that the call to OEMC "provided enough information that the officers were able to independently corroborate." The State on appeal thus echoes the trial court, which found that officers "got a call, a pretty specific call, went to a specific address, people with guns, [and] that raises a level of concern for a police officer in the city."

¶ 46　This focus on corroboration loses sight of *Terry*'s critical demand: reasonable suspicion that the person apprehended is committing or has committed a criminal offense. *Terry*, 392 U.S. at 30; see *Lozano*, 2023 IL 128609, ¶ 35. Even assuming the call to OEMC reported "people with guns," Officer Gray testified he did not see guns on the men, who, again, were sitting on a front stoop socializing. And corroboration that Sanders was heavyset, wearing a blue shirt, and had styled his hair in dreads was *not* corroboration that he was committing or had committed a criminal offense.

¶ 47　Several factors may support an officer's claim that he had reasonable suspicion to stop a person: (i) whether the stop occurred in a high-crime area, (ii) whether the incident occurred late

at night or in the early hours of the morning, (iii) whether the person engaged in unprovoked flight from police officers, and (iv) whether the person's behavior was consistent with the officer's knowledge of criminal activity. *Lozano*, 2023 IL 128609, ¶ 38.

¶ 48 None of these factors justify finding that the officers had reasonable suspicion to conduct a *Terry* stop of Sanders. Officer Gray did not testify that stop occurred in a high-crime area. The stop occurred in the evening, not late at night or in the early hours of the morning. The men immediately complied with the order they received, despite the lieutenant's refusal to wait at the front gate or to ask any questions at all. And the men were enjoying one another's company on the front stoop of a house, which, understandably, Officer Gray never testified was consistent with his knowledge of criminal activity. *E.g.*, *People v. Croft*, 346 Ill. App. 3d 669, 675-76 (2004) (officer's belief that it " 'just seemed strange' " for defendant to walk his bicycle at 11:15 p.m. in a neighborhood where acts of vandalism had occurred days before was insufficient to establish reasonable suspicion that a crime had been or was about to be committed).

¶ 49 The State relies on *Colyar* to contend, "*Terry* does not require that an officer first prove that an individual possess a firearm illegally." That incorrectly reads *Colyar*, which analyzed whether an officer had reasonable, articulable suspicion justifying a *Terry* frisk, not a stop. *Colyar*, 2013 IL 111835, ¶ 50. As we explained, police first must justify the investigative detention before a frisk may occur. *Johnson*, 555 U.S. at 326-27; *Terry*, 392 U.S. at 30. That is exactly what occurred in *Colyar*, where "[t]he contested conduct arose during an incident that both parties agree was initiated as a proper *Terry* stop." *Colyar*, 2013 IL 111835, ¶ 1.

¶ 50 The officers would have acted well within constitutional constraints by approaching Sanders or the other men to ask questions they had. See generally *McDonough*, 239 Ill. 2d at 268

- 12 -

(describing three tiers of police-citizen encounters including third tier, consensual encounter). But the officers lacked a reasonable, articulable suspicion that Sanders had committed, or was committing, a crime as he socialized.

¶ 51 Thus, the officers lacked a proper basis for a *Terry* stop. *Lozano*, 2023 IL 128609, ¶ 40.

¶ 52                         ii. Frisk

¶ 53 The parties also dispute whether the officers had a reasonable, articulable suspicion that Sanders was armed and dangerous. We note that a tension arises from caselaw broadly interpreting gun rights and caselaw permitting the police to detain people lawfully. As the parties contend, the police's reliance on apparently anonymous calls to OEMC further stokes that tension.

¶ 54 Our supreme court has cautioned us against deciding constitutional issues unnecessary to resolve the appeal. *People v. Bass*, 2021 IL 125434, ¶¶ 28-31. Having determined that the police lacked a valid basis for the stop, we do not reach the remaining constitutional question.

¶ 55                     iii. Warrantless Search

¶ 56 Although not raised by Sanders or bearing on our decision, we question whether *Terry* permits a warrantless search of people in the curtilage of a home. *Terry* permitted a brief detention, grounded in reasonable suspicion, in a public place. *Terry*, 392 U.S. at 22-23. *Terry* did not concern officers entering protected property to search for evidence.

¶ 57 The fourth amendment draws its firmest line at the home and its curtilage. In *Florida v. Jardines*, 569 U.S. 1, 5-7 (2013), officers' entry onto a front porch to investigate was a search because it exceeded the limited license to approach and knock. That "implicit license" does not extend to investigative conduct. *Id.* at 8-9. The Supreme Court reinforced the point in *Collins v. Virginia*, 584 U.S. 586, 592-94 (2018), where even a brief physical intrusion into a partially

enclosed area of a driveway constituted a search of curtilage requiring a warrant. Once officers physically enter protected space to gather evidence, search principles govern.

¶ 58    Illinois courts follow the same principle. *People v. Bonilla*, 2018 IL 122484, ¶ 27 ("We conclude that the threshold of the door to defendant's apartment falls within the curtilage of the home."). So, officers entering a fenced yard to conduct a *Terry* stop without an independent, legal basis—consent, a warrant, or exigent circumstances—causes us concern. As the Supreme Court explained in *United States v. Dunn*, 480 U.S. 294, 300 (1987), curtilage is part of the home under the fourth amendment and entitled to the same constitutional protections.

¶ 59    But we do not today decide whether the officers' warrantless entry into the curtilage to search Sanders falls within a "few specific exceptions" our courts recognize as lawful. See *Pitman*, 211 Ill. 2d at 513; *Bass*, 2021 IL 125434, ¶¶ 28-31.

¶ 60                                    *Remedy*

¶ 61    When the police violate a defendant's constitutional rights by, for instance, conducting an unconstitutional stop, courts refer to the violation as a poisonous tree, the fruits of which courts will suppress. *Lozano*, 2023 IL 128609, ¶ 44. Yet "evidence which comes to light through a chain of causation that began with an illegal seizure is not *per se* inadmissible." *People v. Henderson*, 2013 IL 114040 ¶ 34. Courts "consider whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the taint imposed upon that evidence by the original illegality." (Internal quotation marks omitted.) *Id.* ¶ 33.

- 14 -

¶ 62    For the reasons explained, the Chicago police illegally stopped Sanders within moments of leaving their squad cars, and no intervening circumstance removed the taint from the original illegality. Thus, the trial court should have suppressed the gun as the fruit of the poisonous tree.

¶ 63    Without the gun, the State cannot prove Sanders was a felon in possession of a firearm.

¶ 64    We reverse Sanders's conviction outright. See, *e.g.*, *People v. Eubanks*, 2019 IL 123525, ¶ 100 ("Because the State cannot prove the aggravated DUI charge without that evidence, we affirm the appellate court's judgment reversing that conviction outright.").

¶ 65    Reversed.

*People v. Sanders*, 2026 IL App (1st) 230041

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 21-CR-12982(01); the Hon. Ursula Walowski, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Sarah Curry, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak and David Greenspan, Assistant State's Attorneys, of counsel, and Richard Lee, law student), for the People. |