2021 IL App (1st) 182367-U

FOURTH DIVISION
November 24, 2021

No. 1-18-2367

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14 CR 12196 |
| DOMINIQUE HODRICK, | ) ) | |
| Defendant-Appellant. | ) ) ) ) ) | Honorable James B. Linn, Judge Presiding. |

PRESIDING JUSTICE REYES delivered the judgment of the court.
Justices Rochford and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Affirming the judgment of the circuit court of Cook County where (1) the evidence was sufficient to find defendant guilty of first-degree murder beyond a reasonable doubt, (2) the trial court did not err in denying defendant's motion to suppress where the investigative alert was supported by probable cause and not unconstitutional, (3) defense counsel was not ineffective for failing to request a second-degree murder jury instruction, and (4) the State abided by the trial court's pretrial rulings on evidentiary issues.  We, however, vacate defendant's conviction for knowing murder under the one-act, one-crime doctrine.

¶ 2    After a jury trial, defendant Dominique Hodrick was found guilty of first-degree murder

for the shooting death of Betty Howard. Defendant was sentenced to 60 years' imprisonment with an additional 20 years for firearm enhancement for a total sentence of 80 years. On appeal, defendant argues (1) the evidence was insufficient to prove him guilty beyond a reasonable doubt of first-degree murder either as the principal or under an accountability theory, (2) the trial court erred in denying his motion to quash and suppress evidence as investigative alerts are unconstitutional, (3) defense counsel was ineffective for failing to request a second-degree murder jury instruction, (4) he received an unfair trial due to prosecutorial misconduct, and (5) his two convictions for the first-degree murder of Howard violate the one-act, one-crime rule. For the reasons which follow, we affirm and vacate one conviction for first-degree murder pursuant to the one-act, one-crime doctrine.

¶ 3                        BACKGROUND

¶ 4      Defendant was charged by indictment of first-degree murder in the shooting death of Howard on May 29, 2014. Howard, who was working at the Kale Realty office located at East 79th Street and South Evans Avenue, was shot and killed after a bullet came through the building façade, striking her. The State proceeded to trial on counts 8 and 9 of the indictment which charged defendant with first-degree murder under two different theories, intentional murder (720 ILCS 5/9-1(a)(1) (West 2014)) and strong probability of death (720 ILCS 5/9-2(a)(2) (West 2014)) and that defendant personally discharged a firearm in the commission of the offense.

¶ 5                         Pretrial

¶ 6            *Motion to Quash Arrest and Suppress Evidence*

¶ 7      Defendant filed a motion to quash arrest and suppress evidence in which he asserted that his arrest was illegal where it was made without probable cause or a warrant.

¶ 8      At the suppression hearing, Officer Jamie Luna of the Chicago Police Department

testified that on June 10, 2014, at 2:49 p.m. he observed defendant—who he identified in court—sitting in the rear seat of a Dodge Charger. Officer Luna approached the vehicle, identified defendant, and placed him into custody. Officer Luna testified that defendant's arrest was based on "an active investigative alert probable cause to arrest"; however, no warrant had been issued for defendant's arrest at that time. Officer Luna then drove with defendant back to the police station. The State stipulated that while defendant was in custody, Officer Luna made "some statements regarding the police investigation of the shooting of Betty Howard."

¶ 9    On cross-examination, Officer Luna testified that he works for the gang unit of the Chicago Police Department and had been looking for defendant since May 30, 2014. On that date he met with Detective Patrick Ford. Detective Ford informed him about Howard's murder and that video surveillance captured an individual walking outside the apartment building at 720 East 79th Street (the 720 building) with a handgun in his hand. This individual then raised the weapon, pointed in the direction of 735 East 79th Street where Kale Realty was located, and fired the weapon. The individual then went back inside the apartment building. Detective Ford informed Officer Luna that several Chicago police officers identified defendant as being the individual seen in the videotape and that an investigative alert had been issued for defendant. Officer Luna testified that his "top priority" became trying to locate defendant.

¶ 10    Officer Luna further testified that on June 10, 2014, he learned defendant was at a Motel 6 in Lansing, Illinois. When he arrived at the location, he set up surveillance and eventually observed defendant outside the Motel 6 seated in a vehicle. Thereafter, he placed defendant under arrest based on the information provided to him by Detective Ford.

¶ 11    On redirect, Officer Luna testified he had not seen the videotape of the shooting but had viewed still images of the individual derived from the videotape.

¶ 12    The defense rested and the State called Detective Ford to testify.  Detective Ford testified that he is a homicide detective for the Chicago Police Department.  On May 29, 2014, at 6 p.m. he received an assignment regarding the homicide of Howard which occurred on East 79th Street and South Evans Avenue.  Detective Ford traveled to the scene with his partner, Detective William Meister.  The responding officers informed him that there were two 9-mm shell casings discovered in front of the 720 building.  He went to that location and observed the shell casings in front of the doorway on the sidewalk.  After speaking with other officers on the scene, he learned that there was a videotape of the shooting.  Detective Ford testified that he viewed the surveillance videotape in the basement of the apartment building.  He observed that the timestamp on the video was approximately three hours behind.

¶ 13    The surveillance videotapes were then published.  Detective Ford described what occurred on the videotapes for the court.  First he noted that an individual wearing a grey shirt exited the 720 building and pointed a handgun in a southeast direction, which "would have been where Mrs. Howard was."  The individual then ran back inside the 720 building with the weapon in his hand and placed it in his waistband as he ran through the lobby.  The same individual was then captured on video surveillance of the third floor of the building.  The third floor images clearly depicted the individual's face.  Detective Ford used these videos to create still images of the suspect.

¶ 14    Detective Ford further testified that he made efforts to identify the shooter, including contacting several gang officers that were assigned to the sixth district.  They met with him on May 30, 2014, and he presented them with the still images.  Ten officers viewed the images individually and three officers identified the individual as defendant.  According to Detective Ford, Officer Todd Muller was assigned to the area where the offense occurred and he "knew all

the players" and had had contact with defendant, whom Officer Muller identified by name. Officers Matthew Kennedy and Bobby Weatherly indicated they had several contacts with defendant in the past.

¶ 15    In addition, Detective Ford presented another Chicago police officer, Officer Don Hoard, with the still images and he indicated that there had been a disturbance earlier in the day on May 29, 2014, in which defendant had been involved.  Officer Hoard also stated that defendant had been wearing the same clothing earlier that day that he had on in the still images.

¶ 16    Upon identifying defendant, Detective Ford asked a gang investigation team if they would look for defendant and arrest him.  Detective Ford also issued an investigative alert on May 30, 2014, at 6 p.m. as defendant was suspected of being the individual who killed Howard on May 29, 2014.  In the narrative portion of the investigative alert, Detective Ford wrote that defendant had been positively identified as one of the individuals who had discharged a weapon causing the death of Howard.  Thereafter, Officer Luna arrested defendant on June 10, 2014.

¶ 17    On cross-examination, Detective Ford testified that at the time he issued the investigative alert he had not located any witnesses that identified defendant on the scene as firing a weapon. Detective Ford also clarified that the officers identified defendant from the third floor still images and defendant was not observed with a weapon in those images.

¶ 18    The defense rested and presented closing argument in which defense counsel argued that the investigative alert was not accurate because no one witnessed defendant firing the weapon. Defense counsel further argued that detectives did not have enough information to obtain a warrant at the time the investigative alert was issued.

¶ 19    The trial court denied the motion to suppress.  In doing so, the trial court stated it found the testifying officers to be credible and compelling witnesses.  The trial court further found that

the individual who appears in the 720 building lobby firing a weapon "looks basically identical to the person that was captured on the third floor." Regarding probable cause, the trial court found that the case was "actually brimming with probable cause." The trial court observed that defendant was identified from the still images by officers who knew him and that it was "more probable than not" that the person in the lobby was the same person depicted on the third floor. Thereafter, defendant filed a motion to reconsider the motion to quash arrest and suppress evidence, which the trial court denied.

¶ 20    Defendant then filed a motion to suppress his statements to the detectives. In the motion, defendant asserted that his statements were involuntary and that he waived his rights because he was threatened and battered by the police officer who rode in the back seat with him from Lansing to Chicago.

¶ 21    At the second suppression hearing, Officer Patrick Fahey testified that he was assigned to the gang investigations division and was working on June 10, 2014, looking for an individual who had an investigative alert. He, along with other officers, set up a point of surveillance for a motel in Lansing, Illinois. Officer Fahey observed defendant in the rear passenger seat of an automobile. Officer Fahey had defendant exit the vehicle and Officer Luna placed defendant into custody. Officer Luna issued defendant his *Miranda* warnings. Officer Fahey could not state with certainty where he sat in the police vehicle as he and Officer Craig Brownfield transported defendant to Chicago. He did recall that he was a passenger in the vehicle. Officer Fahey denied telling defendant that he was "going to go away for the rest of his life." He also denied slapping defendant.

¶ 22    According to Officer Fahey, he did not inform defendant why he was under arrest. Officer Fahey testified it was standard procedure to advise an individual that they are "being

arrested for an investigative alert" and when defendant asked what that is, Officer Fahey replied, "it's like a warrant." Officer Fahey did not ask defendant any questions during the drive. Officer Fahey further testified he assisted in placing defendant in an interview room. Four video clips of defendant in the interview room were published. None of those video clips depicted any of the officers or detectives striking or threatening defendant.

¶ 23 On cross-examination, Officer Fahey testified that he rode in the rear of the vehicle with defendant due to the violent nature of the offense and the length of the drive back to the police station. He further testified that defendant was cooperative when he was placed into custody.

¶ 24 Detective Ford testified that on June 10, 2014, he became aware that defendant had been taken into custody and was transported to the police station. Detective Ford met with defendant at 8:41 p.m. and informed him of his *Miranda* rights. Defendant indicated he wanted to speak to him. Defendant was interviewed for 10 minutes and made an exculpatory statement. Detective Ford then left the interview room and obtained a coat for defendant to wear and a bottle of water for him to drink. Two hours later, Detective Ford spoke with defendant again. Defendant made an exculpatory statement; however, when confronted with information learned during the investigation defendant made an inculpatory statement. Defendant never mentioned being slapped or threatened by the arresting officers. A clip of Detective Ford's first interview with defendant was published to the court and did not depict the detectives slapping or threatening defendant.

¶ 25 The parties rested and the trial court heard closing argument. The defense maintained that the State had not met its burden of proof that defendant's statement was given only after he was physically assaulted and threatened.

¶ 26 The trial court found the testimony of the officers to be credible and compelling, noted

that defendant presented no evidence in support of his claims, and thus denied the motion.

¶ 27                     *Motion for Nontraditional Other-Crimes Evidence*

¶ 28    The State filed a motion to admit "non-traditional other crimes evidence" seeking leave to introduce evidence of two unrelated homicides connected to defendant. The first homicide occurred on March 11, 2013, when Jonathan Watkins and his infant daughter Jonylah were shot inside their vehicle. Three days later, defendant voluntarily spoke with detectives at the police station because "word on the street" was that he was the shooter. Defendant was never charged regarding this offense. The State sought to admit this evidence to establish defendant had, in the past, voluntarily spoken with detectives and did not fear police officers.

¶ 29    The second homicide occurred on January 29, 2014, on the third floor of the 720 building. Defendant was present at the time of the shooting and admitted to detectives that he was depicted in video surveillance footage of the third floor of the 720 building. Ultimately, no one was charged in the murder. The State argued that this evidence was relevant because it went to defendant's familiarity with the 720 building and his knowledge that the premises was equipped with video surveillance.

¶ 30    Defendant argued that this evidence should not be allowed because the jury's knowledge of defendant's involvement in prior homicides was more prejudicial than probative. He further maintained that any details regarding the homicides, such as the fact an infant had been killed, was also highly prejudicial.

¶ 31    The trial court ruled that no details regarding either homicide were to be revealed to the jury, including the fact that these incidents involved homicides. The trial court further ruled that should defendant testify that he was fearful of the police, then the State could address the 2013 incident, but how the State would fashion its questioning would be considered only at that time.

Regarding the January 29, 2014, homicide, the trial court allowed the State to elicit testimony that defendant was familiar with the 720 building and knew it was equipped with video surveillance. Although the State informed the trial court that it was not offering the other-crimes evidence as proof of defendant's gang-related motive, defendant did not present a motion *in limine* barring the State from eliciting gang evidence.

¶ 32                                            Trial

¶ 33    The matter then proceeded to trial with the State first presenting Bruce Stafford who testified that on May 29, 2014, he was working at Kale Realty as the assistant manager. The Kale Realty office was located at 735 East 79th Street at the intersection of East 79th Street and South Evans Avenue. Howard was an employee for Kale Realty, but had been working out of a different location. On May 29, 2014, Howard telephoned Stafford and asked if she could do some paperwork at that office location. Stafford invited her to use the office. It was the first time Howard had been at that Kale Realty location. When Howard arrived Stafford was present along with three other agents, Adrienne Craig, Louis Hardy, and Rachel Burson. They were all situated along the west wall adjacent to South Evans Avenue. Stafford testified that at 5:27 p.m. he heard a gunshot followed by more gunshots. Stafford observed fragments from the wall come off and the "chairs were getting shot" as the gunfire entered the building. Hardy was grazed by a bullet in the abdomen. Howard, who had been standing with her back facing the west wall, was struck by a bullet. Howard appeared to be gravely injured. Stafford testified he ran outside, flagged a police officer down, and had him enter the Kale Realty office. First responders arrived within minutes.

¶ 34    Stafford further testified that he did not hear anything outside prior to hearing the gunshots. Stafford also testified that certain photographs accurately reflected how the Kale

Realty office appeared in May 2014. These photographs were admitted into evidence and published to the jury.

¶ 35    On cross-examination, Stafford testified that he heard one gunshot followed by three additional shots in rapid succession. He did not observe who fired the shots.

¶ 36    The parties then entered a stipulation regarding still images recorded from a surveillance camera located at 735 East 79th Street facing southbound on South Evans Avenue and facing eastbound on East 79th Street. The parties further stipulated to digital images recorded from this surveillance camera on May 29, 2014, from 4 p.m. until 6 p.m. The parties also stipulated to the admission into evidence of surveillance footage from a camera located at 739 East 79th Street taken on May 29, 2014, from 5 to 5:46 p.m.

¶ 37    Brittany Williams testified that on May 29, 2014, shortly before 5:30 p.m. she was walking her dog near the intersection of East 79th Street and South Evans Avenue. As she was walking northbound on South Evans Avenue she heard a gunshot followed by two more gunshots. Each of the gunshots sounded the same, but she could not determine from which direction the gunshots were fired. Williams further testified that she heard tires screeching on South Evans Avenue. She attempted to run home down East 79th Street but she collapsed and was assisted by emergency medical technicians. She realized she had been grazed by a bullet on the side of her left hand. Williams testified to the truth and accuracy of still images taken from a surveillance camera in the area as it depicted her walking her dog and reacting to the gunfire on May 29, 2014. Williams also testified that video footage depicting her coming around the corner on East 79th Street and collapsing was true and accurate. These still images and video surveillance footage were admitted via the previous stipulation and were published to the jury.

¶ 38    On cross-examination, Williams testified she did not observe where the shots came from

or who fired the shots. Williams denied seeing a four door red Cadillac followed by a gray vehicle speed away southbound on South Evans Avenue and explained she only heard tires screeching. She denied telling a police officer that she saw a red Cadillac and a gray vehicle speeding down the street. She also denied telling a police officer that she assumed the shots came from the gray vehicle.

¶ 39    On redirect, Williams testified that prior to hearing the gunshots she did not hear any arguing or yelling nearby.

¶ 40    Rachel Burson testified that on May 29, 2014, she was working at Kale Realty on 735 East 79th Street. At 5 p.m. she was at the office with Stafford, Hardy, Craig, and Howard, whom she had just met. Howard appeared to be in a rush and went directly to the fax machine. After she used the fax machine, Howard approached Burson and they spoke near her desk on the west wall. She and Howard were standing shoulder to shoulder when the gunshots were fired in rapid succession. Both of them got on the ground. When Howard got up, she was holding her neck. Brunson knew Howard had been injured and instructed her to lie down and not to move.

¶ 41    Adrienne Craig testified that on May 29, 2014, she was a leasing agent at Kale Realty working out of the office on 735 East 79th Street. Howard entered the office right before 5 p.m. At 5:27 p.m. Craig heard gunshots. Prior to that she did not hear any loud commotion outside. After hearing the second shot everyone in the office attempted to hit the floor, but a bullet came through the wall and struck Howard in the neck. Another bullet grazed Hardy's stomach. Stafford went outside of the office to flag down a police officer and an ambulance arrived shortly thereafter.

¶ 42    On cross-examination, Craig testified she did not see where the shots came from aside from coming through the wall. She also testified she heard one shot followed by two more shots.

¶ 43     Lamar Giles testified that he is the building maintenance man and resides on the premises of the 720 building.  According to Giles, the 720 building is large with its only entrance on East 79th Street.  It has a second and third floor with 26 apartments in the building and was equipped with video surveillance cameras.

¶ 44     Giles testified that on January 29, 2014, an incident occurred in the building on the third floor in apartment 301 and he assisted in providing the police access to the surveillance equipment.  On May 29, 2014, he again assisted the police in gaining access to the surveillance equipment.  Within days of the shooting death of Howard, the video surveillance equipment was stolen.

¶ 45     Giles further testified that apartment 301 was vacant from January through May 2014 and that apartment 302 had been occupied by a woman but she had moved out.  Giles was also aware that the owner of the building, Mark Loncar, had provided the police with keys to the building.  Giles testified to the truth and accuracy of photographs depicting the 720 building, which were admitted into evidence and published to the jury.

¶ 46     On cross-examination, Giles testified he was not present at the 720 building on May 29, 2014, when the shooting occurred.

¶ 47     Johnny Hendricks, a paramedic for the City of Chicago, testified that on May 29, 2014, just before 5:30 p.m., he and his partner were returning from a call and were traveling eastbound on East 79th Street near South Evans Avenue.  The windows in the ambulance were open.  As he passed the intersection of 79th and Evans and was stopped at a red light one block away, he heard between four and eight gunshots in rapid succession.  Hendricks, who is a gun owner, testified that the shots sounded like they came from a single weapon.  Hendricks observed a Chicago police officer running toward the sound of the gunshots.  Hendricks radioed his

dispatcher to let them know shots had been fired. The dispatcher informed him that a person was shot and to respond.

¶ 48    Hendricks testified that when he arrived at 79th and Evans he was directed inside a building where Howard was positioned on the floor. Hendricks assessed Howard, provided her with medical treatment, and transported her to the ambulance. As they drove to the hospital, Howard was in full cardiac arrest.

¶ 49    On cross-examination, Hendricks testified he could not determine what kind of weapon the gunshots were fired from based on the sound. He also testified that he did not observe the shots being fired.

¶ 50    Officer Antonio Brand of the Chicago Police Department testified that on May 29, 2014, he was assigned to foot patrol in the vicinity of East 79th Street and South Evans Avenue. At 5:27 p.m. he was at the currency exchange one block from 79th and Evans when he heard five rapid gunshots, but did not observe anyone shooting. According to Officer Brand, the gunfire sounded as though it came from a single weapon. When he heard the shots fired, he jogged to South Evans Avenue and observed someone flag him down. He crossed the street to 735 East 79th Street and entered the Kale Realty office. He observed Howard on the ground with an apparent gunshot wound. Officer Brand radioed for an ambulance. He then went outside and observed numerous people around the intersection. He was assigned to stay on the crime scene near the wall where the bullets had entered to protect the scene.

¶ 51    On cross-examination, Officer Brand testified that someone relayed to him that a silver vehicle had just fled the area traveling southbound on South Evans Avenue.

¶ 52    Steven Swain, an evidence technician for the Chicago Police Department, testified that he investigated the scene at East 79th Street and South Evans Avenue on May 29, 2014. He first

observed the Kale Realty office and noted that there were a couple of fired bullets on the floor and a few defects in the interior of the office walls. On the exterior of the building he viewed four defects. He further testified he discovered two fired 9-mm cartridge cases near the front doorway on the sidewalk at 720 East 79th Street. In addition, he took photographs of the scene which were admitted into evidence and published to the jury.

¶ 53 On cross-examination, Swain testified he did not know whether the exterior wall defects to the Kale Realty office were made due to gunfire. He also could not opine on the type of weapon the bullets he recovered came from.

¶ 54 Caryn Tucker, an expert in firearm and toolmark examination and employed by the Illinois State Police, Division of Forensic Services, testified that she was assigned to analyze the firearms evidence recovered in this case. She determined that the two fired cartridge casings were 9-mm Luger caliber and opined that they were fired from the same firearm. She further testified she received three fired bullets and opined that they were 9-mm and were fired from the same firearm.

¶ 55 On cross-examination, Tucker testified that a .22-caliber revolver would not expel cartridge casings. Tucker could not opine regarding whether the bullets were fired from a semiautomatic weapon or a revolver. Tucker further testified that the bullets recovered from inside the Kale Realty office were not from a .22-caliber revolver.

¶ 56 Officer Eric Szwed, a forensic investigator employed by the Chicago Police Department, testified that on June 11, 2014, he was assigned to utilize trajectory rods in apparent bullet holes in the side of the Kale Realty office for demonstration purposes. The rods themselves are 18 to 24 inches long and are used to show the path of bullet holes. There were four bullet holes on the west side of the building and another hole appeared near the entrance on the side of the building.

Photographs of the trajectory rods in the bullet holes were admitted into evidence and published to the jury. Each of the trajectory rods placed in bullet holes located on the west side of the building pointed in a northwest direction, which would be kitty corner from Kale Realty. Szwed further testified that there were two holes where each bullet entered, one in the exterior wall and one on the interior drywall. According to Szwed, having two holes in which to insert the trajectory rod makes the trajectory angle more accurate. Regarding the defect in the exterior wall that was further south on South Evans Avenue, Szwed testified that this trajectory was "in a more northerly [*sic*] direction."

¶ 57 Szwed further testified that he was directed to examine a bullet defect in the exterior east wall of the Kale Realty office. He began by cutting a hole into the drywall where the initial hole was observed. He failed to find a bullet lodged in the drywall at that point, so he proceeded to cut a hole at the base of the wall to see if the bullet had dropped on the interior side of the wall. He was then able to locate the bullet just inside of the white baseboard on a two-by-four. He then recovered the bullet and inventoried it.

¶ 58 On cross-examination, Szwed testified that he was not sure whether the hole in the exterior wall, which was located away from the grouping of four bullet holes, was from a fired bullet. He clarified that this hole was larger than the four other holes and it was "a possibility" that this hole could have been caused by a different caliber bullet. He also did not discover a bullet in the vicinity of this hole. He testified that he is not certain whether this hole was caused by a bullet but it could have been.

¶ 59 The parties stipulated that, if called as a witness, Jennifer Barrett would testify that she is employed as a forensic scientist with the Illinois State Police Crime Lab and is assigned to the fingerprint section. She would further be qualified as an expert in the forensic science of latent

fingerprint analysis and comparison. Barrett would testify that she examined the two fired cartridge casings and they were no longer suitable for the purpose of analysis.

¶ 60    Angela Kaeshamer, a forensic scientist employed by the Illinois State Police Forensic Science Center at Chicago in the Biology and DNA section, testified as an expert that because the bullets and their casings are exposed to an excessive amount of heat, the DNA breaks down and limits the ability to obtain a DNA profile. Accordingly, in this case, she was unable to obtain any DNA suitable for analysis from the fired casings and bullets.

¶ 61    Officer Matthew Kennedy of the Chicago Police Department testified that he belongs to the Gang Investigations Division, Bureau of Organized Crime. He explained his current role as part of the Gang Intelligence Unit as one where he does "a lot of workup in long-term investigations on violent gangs across the city[.]" In May 2014, however, he was not assigned to the Gang Investigations Division but was a plain-clothes officer in the 6th District, which includes the intersection of East 79th Street and South Evans Avenue. His role was to suppress any type of violent crimes in the district, gather gang intelligence, and assist citizens. Officer Kennedy testified that, prior to the May 29, 2014, shooting, he knew defendant as he had spoken with him several times during his course of dealings as an officer in the 6th District.

¶ 62    Officer Kennedy further testified that on May 30, 2014, he went to the police department and met with Detective Ford who showed him several photographs and asked for Officer Kennedy's assistance in identifying the individual depicted in those photographs. Officer Kennedy testified he identified the individual in the photographs as defendant. The photographs shown to Officer Kennedy were admitted into evidence and published to the jury. Officer Kennedy then identified defendant from video surveillance footage taken around the time of the May 29, 2014, shooting. Immediately thereafter, the trial court instructed the jury that "the

testimony you heard about the officer's prior dealings with [defendant] and the fact that he's had conversations with him in the past, that's solely given to you as a basis for the identification that he's claiming to make in open court today, not to be considered by you for any other reason whatsoever." Officer Kennedy also testified that he has observed defendant in the vicinity of the 720 building "several times."

¶ 63    Officer Don Hoard of the Chicago Police Department testified that on May 29, 2014, he had been assigned to the 6th District (which encompassed the intersection of East 79th Street and South Evans Avenue) as a foot patrol officer for almost two years.  At 3:15 p.m. that day, he and his partner Officer Darryl Holmes, were alerted by some citizens to a disturbance at Billy's Tavern.  The officers went to that location and Officer Hoard observed two groups of men in a verbal altercation.  One of the men involved in the altercation was identified by Officer Hoard in court as defendant.  Officer Hoard testified he observed defendant daily while on his foot patrols in the 6th District.  Officer Hoard dispersed the group and radioed his sergeant to request more units be sent to the area. That afternoon, he was relieved by other officers and as he drove back to the police station heard a call of shots fired over the radio.  The shots were reported in the vicinity of East 79th Street and South Evans Avenue.  Officer Hoard drove back to the 720 building to view the video surveillance footage.  As he entered the building he observed fired shell casings and alerted officers to their presence.  Officer Hoard accessed the surveillance footage and "was able to pull up the frames in which I saw the defendant walk, peek out the door, and then he came back out again and began firing what looked like a weapon."  Officer Hoard identified the individual depicted in the surveillance footage as defendant.

¶ 64    Officer Hoard further testified that the following day he met with Detective Ford who presented him with a series of photographs.  Officer Hoard identified defendant as the individual

depicted in those photographs and informed Detective Ford that defendant was wearing the same clothing he had on at 3:15 p.m. at Billy's Tavern.

¶ 65   In addition, Officer Hoard testified he was also familiar with the 720 building which, according to Officer Hoard, he had been called to on January 29, 2014. The owner of the apartment building provided Officer Hoard with access to the building and the video surveillance system. Officer Hoard testified he viewed the video surveillance from January 29, 2014, and observed defendant on the videotape.

¶ 66   On cross-examination, Officer Hoard clarified that he did not observe defendant every single day but would see him "quite often."

¶ 67   After Officer Hoard was excused, the trial court offered a limiting instruction to the jury. In the instruction the trial court advised the jury that "[e]vidence has been received that the defendant has been involved in conduct other than that charged in the indictment" and that this evidence was to be used for identification and presence only. The trial court further informed the jury, "[i]t is for you to determine whether the defendant was involved in that conduct and, if so, what weight should be given to this evidence on the issues of identification and presence."

¶ 68   Dr. Ponni Arunkumar, the medical examiner of Cook County, testified that Howard's cause of death was a gunshot wound to the back and the manner of death was homicide.

¶ 69   Detective Lorenzo Sandoval of the Chicago Police Department testified that on January 29, 2014, he was investigating an unrelated incident that occurred at the 720 building outside of apartment 301. During the course of his investigation he was able to view the video surveillance footage of the lobby and the third floor. Detective Sandoval identified defendant in court as one of the individuals in that video surveillance footage. Detective Sandoval interviewed defendant at the police station on March 27, 2014. During this interview, defendant acknowledged that he

was on the third floor of the 720 building on January 29, 2014.

¶ 70    Officer Jamie Luna of the Chicago Police Department testified that on May 29, 2014, he was assigned to the Gang Investigations Unit.  On May 30, 2014, he met with Detective Ford and was advised of the investigative alert issued for defendant and, according to Officer Luna, that there was probable cause for his arrest.  Officer Luna was then assigned to locate defendant.  He visited multiple residences but was unable to locate defendant.  On June 10, 2014, he received information that defendant was inside a Dodge Charger outside of a Motel 6 in Lansing, Illinois.  Officer Luna, along with Officers Brownfield and Fahey, arrived at the location and set up surveillance.  They identified defendant inside a Dodge Charger, approached him, and transported him back to the Chicago police station without incident.

¶ 71    Detective Ford testified consistently with his testimony at the suppression hearing.  In addition, Detective Ford testified that he initially viewed the scene at Kale Realty then went to the 720 building where he observed two fired shell casings directly outside the front door.  Once inside the 720 building he went into the basement and viewed the surveillance footage of the incident.  Detective Ford described what he viewed in the surveillance footage—an African-American man walking out of the apartment building, discharging a firearm, and then running back into the building.  The same individual was then viewed on the third-floor surveillance footage shortly after he had entered the building.  The video surveillance footage was obtained and short clips and still images were produced from that footage.  These items were admitted into evidence and published to the jury.  The videotape shows the lobby of the 720 building and an African-American man walk through the lobby, peek out the front door, open the front door, walk outside a few steps left of the front door while raising his weapon in the direction of Kale Realty, and then run back into the 720 building with the firearm in his right hand.

¶ 72     Detective Ford further testified that on May 30, 2014, he presented five still images from the surveillance footage to certain 6th District police officers in an attempt to identify the individual depicted. Detective Ford asked each officer separately if they knew the individual in the photographs. According to Detective Ford, Officer Kennedy immediately identified the individual as defendant by name. Officer Hoard also identified the individual as defendant and informed Detective Ford that defendant was wearing the same clothing he had been wearing earlier that day at Billy's Tavern. Detective Ford then issued an investigative alert for defendant so he could be located. Detective Ford also spoke to 10 officers regarding the crime and asked them for assistance in locating and arresting defendant. Detective Ford further testified that he was present when the trajectory rods were placed and that the trajectory rods pointed northwest to the front door of the 720 building.

¶ 73     Detective Ford testified that on June 10, 2014, defendant was arrested and brought to the police station. Defendant waived his *Miranda* rights and was interviewed at 8:41 p.m. Defendant was interviewed again at 10:32 p.m. until 11:25 p.m. Defendant's interviews were recorded, admitted into evidence, and published to the jury. In his initial interview, defendant denied being present at Billy's Tavern at 3:15 p.m. on May 29, 2014. According to defendant, he was at the barber shop nearby and did not witness the fight. Upon leaving the barber shop, defendant went to the 720 building to smoke on the roof. He then heard yelling, but could not determine where it was coming from, so he went to the front door of the building to see what was going on. When he stepped out onto the sidewalk the shooting started. Shots were being fired from a vehicle. He observed "Nookie" (whose name is James Jones) driving the vehicle. Defendant relayed that he was scared, as this was not the first time that they "came for him." He walked back inside the building and went to apartment 302. When asked by detectives why the

shooting occurred, defendant stated that it was a conflict between two different groups, the "79th street squad" and the "BDs from Vernon." Defendant informed the detectives that earlier that day Jones had stated to him, "We're going to let a mother f*** live today." Defendant denied firing a weapon at 5:27 p.m. on May 29, 2014. He further denied that anyone on the sidewalk was in possession of a weapon at that time. Defendant learned of Howard's death that evening from a cigarette vendor.

¶ 74    After being informed by the detectives that the video surveillance footage did not support his story and that the video depicted defendant holding a firearm, defendant admitted he fired two shots from a .22-caliber revolver at Jones' vehicle striking the driver's side and trunk. He also indicated he had originally believed that shots were being fired from the vehicle, and suggested that someone else must have been shooting from the sidewalk. Defendant added that he exchanged words with Jones earlier in the day. Jones accused defendant of "playing police games" and said, "I should kill your b*** a***." Based on those statements, defendant shot at Jones' vehicle that evening.

¶ 75    On cross-examination, Detective Ford testified that on May 29, 2014, he spoke to Williams who had been walking her dog at the time the shooting occurred. Williams informed Detective Ford that she heard shots fired and observed a four-door red Cadillac followed by a silver vehicle speed away southbound on South Evans Avenue. Detective Ford further admitted that the image of the firearm on the videotape surveillance footage is grainy and that one cannot determine the type of weapon defendant is holding from the footage.

¶ 76    The State rested and defendant moved for a directed verdict, which was denied.

¶ 77    Defendant testified that on May 29, 2014, at approximately 5 p.m. he had an altercation with Jones and then ran into the 720 building. He told his friend, who resided in apartment 302,

that Jones came up to him and told him he was going to kill defendant. Defendant then "sat around smoking" on the roof for a couple of minutes and told his friend, "I can't let him [(Jones)] catch me like that again." Defendant then left the apartment and as he approached the front door of the building he heard people arguing outside. Defendant looked out the front door and observed Jones driving a silver Cutlass with three passengers inside. According to defendant, Jones had previously shot him twice in August 2013, so he was concerned about what Jones was going to do in this situation. Defendant testified that, at the time, he was in possession of a .22-caliber revolver. He stepped outside of the 720 building and fired two shots, which struck the silver Cutlass. One shot hit the driver's passenger side door and the other struck the trunk. Another individual was also outside shooting at the silver Cutlass. This individual was standing four to five feet away diagonally from defendant. Defendant further testified that at the same time he heard additional shots that he believed were fired by Jones. After defendant fired the shots he ran back into the 720 building. He denied firing a 9-mm weapon and firing the shot that killed Howard.

¶ 78    Defendant also testified that, because he was scared, he did not initially disclose to Detective Ford that he shot his .22-caliber revolver. He also did not tell Detective Ford about the other individual who was discharging a weapon because "where I live and where I come from and if you tell on somebody, you will become a snitch." According to defendant, if he had told Detective Ford, "I probably wouldn't be sitting here today fighting for this case."

¶ 79    On cross-examination, defendant testified he obtained the preloaded .22-caliber revolver from a friend named "Mike" and that he used the revolver for protection. He and Mike sold the weapon after the shooting. Defendant admitted he fired the weapon on a public street, in broad daylight, with nothing obscuring his face. He also admitted that he is depicted on the videotape

surveillance footage. In addition, defendant admitted Jones did not shoot at him.

¶ 80    Defendant further testified that while he did not have a Firearm Owner's Identification Card and had no training on firing a weapon, he knew about the different types of firearms available. He expressly stated he knew the difference between a .22-caliber revolver and a 9-mm semiautomatic firearm. When asked whether pulling the trigger to fire bullets from a .22-caliber revolver feels different from firing a 9-mm semiautomatic firearm, defendant replied, "a gun is a gun and if you pull a trigger of a gun the trigger is the same as any other gun that you pull. It don't matter how fast you pull it or how slow you pull it, a trigger is a trigger of a gun."

¶ 81    According to defendant, it was his friend, Lionel Simmons, who was discharging a 9-mm weapon toward Jones' vehicle with the intent to strike Jones. He did not inform Detective Ford of Simmons as he was afraid of being known as a "snitch" and getting killed. Defendant denied being in a gang but agreed he and Simmons were both firing at Jones with the intent to strike him.

¶ 82    Defendant testified that he knew the police were looking to talk to him about a murder the day before he was arrested.

¶ 83    The defense rested and the State presented the testimony of Detective Ford in rebuttal. Detective Ford testified that all of the conversations he had with defendant were recorded. In none of those conversations did defendant inform him that he had an altercation with Jones prior to the May 29, 2014, shooting. Defendant did not inform Detective Ford that Jones threatened to kill him. Defendant did, however, state that on May 28, 2014, Jones pulled up in a vehicle and told defendant "I will let a mother*** live today." He did not tell Detective Ford that Jones had shot him in the past. Detective Ford further testified that defendant told him he knew a woman had been killed immediately after the shooting occurred.

¶ 84    The State rested and the trial court held a jury instructions conference outside the presence of the jury.  Over defendant's objection, the trial court allowed the jury to be instructed on accountability.  Defense counsel did not request a second-degree murder instruction be given.

¶ 85    After hearing closing arguments and jury instructions, the jury deliberated and ultimately found defendant guilty of first-degree murder and that he personally discharged a firearm in the commission of that offense.

¶ 86    Defendant filed a posttrial motion for a new trial, which the trial court denied.  The matter proceeded to a sentencing hearing where, after considering evidence in mitigation and aggravation, the trial court sentenced defendant to 60 years' imprisonment for first-degree murder on each count and a 20-year sentence for personal discharge of a firearm to be served consecutively for a total sentence of 80 years.

¶ 87                                ANALYSIS

¶ 88    On appeal, defendant argues (1) the evidence was insufficient to prove him guilty beyond a reasonable doubt of first-degree murder either as the principal or under an accountability theory, (2) the trial court erred in denying his motion to quash and suppress evidence as investigative alerts are unconstitutional, (3) defense counsel was ineffective for failing to request a second-degree murder jury instruction, (4) he received an unfair trial due to prosecutorial misconduct, and (5) his two convictions for the first-degree murder of Howard violate the one-act, one-crime rule.  We address each issue in turn.

¶ 89                         Sufficiency of the Evidence

¶ 90    Defendant maintains that the State failed to prove beyond a reasonable doubt that he was guilty as the principal for the shooting death of Howard.  Defendant asserts the State presented no evidence which attempted to distinguish between the multiple shooters' bullets sufficient to

establish defendant's guilt; rather, the State's evidence demonstrated that there were multiple shooters, and a total of a minimum of five shots, only two of which defendant was personally responsible for. Defendant concludes as the State did not prove that either of defendant's two shots struck Howard, the State failed to prove beyond a reasonable doubt that he committed the offense. Defendant requests his first-degree murder conviction be reversed. In the alternative, defendant asserts that the State also did not prove him guilty of first-degree murder under an accountability theory.

¶ 91    In response, the State maintains the evidence was sufficient where it established beyond a reasonable doubt that defendant alone discharged a firearm in the direction of the Kale Realty office while intending to shoot Jones and ended up killing an innocent bystander. Although defendant claims he only fired two shots from a .22-caliber revolver, the State presented evidence that a 9-mm handgun was fired a minimum of four times. Thus, it was a question of fact and credibility for the jury—whether or not defendant fired a .22-caliber revolver or a 9-mm handgun—and also how many shots he fired. The State argues that the jury did not believe defendant's version of events and found him guilty of first-degree murder.

¶ 92    When a defendant challenges the sufficiency of the evidence, the reviewing court must determine if, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the offense proven beyond a reasonable doubt. *People v. Pizarro*, 2020 IL App (1st) 170651, ¶ 29. All reasonable inferences from the evidence must be made in the State's favor. *People v. Hardman*, 2017 IL 121453, ¶ 37. Under this standard of review, it is not the reviewing court's role to retry the defendant. *People v. Gray*, 2017 IL 120958, ¶ 35. We may not substitute our judgment for that of the trier of fact with respect to the weight of the evidence or the credibility of witnesses. *People v. Jackson*, 232 Ill. 2d 246, 280-81

(2009). It is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt. *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 67. We will not reverse a conviction unless the evidence is so improbable, unreasonable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt. *People v. Carr-McKnight*, 2020 IL App (1st) 163245, ¶ 52.

¶ 93 An individual commits first-degree murder if, in performing the acts which cause the death, he or she intends to kill or do great bodily harm to a person, or knows that such acts will cause such death or great bodily harm. 720 ILCS 5/9-1(a)(1) (West 2014).

¶ 94 The doctrine of transferred intent applies to situations where "innocent bystanders" are injured. *People v. Hill*, 315 Ill. App. 3d 1005, 1012 (2000). The doctrine holds that one who intends to kill another and kills an unintended victim is not absolved from answering to the crime of murder. *Id.* The determination of whether the defendant acted with the requisite intent to commit first-degree murder is a question of fact and may be inferred from the circumstances surrounding the incident, the defendant's conduct, and the nature and severity of the victim's injuries. *People v. Renteria*, 232 Ill. App. 3d 409, 416-17 (1992).

¶ 95 Defendant does not dispute that he fired a weapon, nor does he dispute that his actions resulted in the death of Howard—indeed, defendant testified that he intentionally fired his .22-caliber revolver at Jones. Rather, defendant contends that the evidence failed to prove that he was the shooter as he fired a .22-caliber revolver twice and the evidence demonstrated that more than four shots were fired, with the victim being struck with a 9-mm bullet.

¶ 96 Here, considering the evidence in the light most favorable to the prosecution, the record demonstrates sufficient evidence from which a rational trier of fact could have found the essential elements of first-degree murder beyond a reasonable doubt. In the present case, the

jury heard two different versions of what occurred on May 29, 2014. In the State's version, defendant discharged a firearm in the direction of Jones' vehicle with the intent to kill him. Instead of striking Jones, defendant's shots struck the west wall of the Kale Realty office, with one striking and killing Howard, an innocent bystander. In defendant's version, he heard a commotion outside the 720 building and went to see what was going on. Upon realizing Jones was outside in a vehicle, defendant exited the building with his firearm drawn and started shooting at Jones immediately as he was frightened that Jones would kill him. As defendant was firing his .22-caliber revolver, his friend Simmons was also firing a handgun at Jones' vehicle. Defendant then ran back inside the 720 building. This case presented a credibility contest between the State's witnesses and the defense's witness. Ultimately, the jury had a choice as to whose version to believe and what culpability, if any, defendant had. The jury believed the State's version that the defendant acted intentionally and alone in shooting Howard. Reviewing courts generally should not second-guess these determinations. See *Gray*, 2017 IL 120958, ¶ 35; *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009).

¶ 97    We further observe that defendant's argument mainly revolves around the number of bullets fired. Defendant maintains the evidence established he only fired two shots, yet the physical evidence established that a minimum of four shots were fired. The State, however, presented trajectory evidence that the bullet holes in the Kale Realty office originated from in front of the 720 building. And while defendant testified that he stepped out of the 720 building and in front of a restaurant when he discharged his weapon, the videotape surveillance from the lobby (which was viewed by the jury) demonstrated he remained in front of the 720 building. The jury was also presented with evidence of defendant's interview with the detectives wherein he initially denied firing a weapon at all and then, upon learning that shell casings were

discovered in front of the 720 building, admitted he fired a revolver—a weapon that is incapable of discharging casings. Then, during his courtroom testimony defendant admitted for the first time that another individual was present and fired a weapon during the incident. Furthermore, additional testimony placed defendant's credibility at odds with the State's witnesses. For example, defendant testified that people were yelling in front of the 720 building before the shooting; yet Stafford, Williams, and Craig testified that they did not hear any arguing or yelling prior to the shooting. See *People v. Aljohani*, 2021 IL App (1st) 190692, ¶ 94 (observing that while there were no "eye" witnesses to the offense there were "ear" witnesses). Multiple witnesses also testified that the shots sounded like they came from the same firearm. *Id.* In this case, the jury was presented with the State's and the defense's evidence and two theories surrounding that evidence and determined defendant intentionally discharged a weapon causing Howard's death. *Gray*, 2017 IL 120958, ¶ 35. Determinations of witness credibility, the weight to be given testimony, and the reasonable inferences to be drawn from the evidence are the responsibilities of the trier of fact, not the reviewing court. *People v. Spiller*, 2016 IL App (1st) 133389, ¶ 28. After considering all of the evidence presented at defendant's trial and viewing that evidence in the light most favorable to the State, we find that the evidence was sufficient to prove beyond a reasonable doubt that defendant was guilty of the first degree murder of Howard. *Id.*; *Carr-McKnight*, 2020 IL App (1st) 163245, ¶ 52.

¶ 98    In sum, we find that the evidence was sufficient to prove defendant guilty beyond a reasonable doubt of first-degree murder as the principal. As we have found the evidence was sufficient to prove defendant guilty beyond a reasonable doubt of first-degree murder as the principal, we need not consider his argument that the evidence was insufficient to prove him guilty of first-degree murder under an accountability theory. See *People v. Fauber*, 266 Ill. App.

3d 381, 386 (1994).

¶ 99                              Motion to Quash and Suppress

¶ 100   Defendant next maintains that the trial court erred in denying his motion to quash and suppress and that the matter should be remanded for a new trial.  Relying on *People v. Bass*, 2019 IL App (1st) 160640, ¶¶ 62, 71, defendant contends his arrest, which was pursuant to an investigative alert, was unconstitutional.  In the alternative, defendant asserts that he was denied effective assistance of counsel where defense counsel failed to move to quash his arrest and suppress his statement on the specific basis that his arrest was based solely on an investigative alert.

¶ 101   The State asserts defendant forfeited review of this claim where he failed to raise it before the trial court in a motion to suppress and a posttrial motion.  Regardless of any forfeiture, the State argues that defendant cannot demonstrate plain error where the investigative alert was supported by probable cause.

¶ 102   When we review a trial court's ruling on a motion to suppress, we review the court's factual findings for clear error and will only reject those findings if they are against the manifest weight of the evidence.  *People v. Bass*, 2021 IL 125434, ¶ 21.  However, we review *de novo* the trial court's ultimate ruling on a motion to suppress.  *Id.*  The defendant bears the burden of proof.  *People v. Simmons*, 2020 IL App (1st) 170650, ¶ 49.  Once the defendant sets forth a *prima facie* case that the seizure was unreasonable, the burden shifts to the State to provide evidence to rebut it.  *Bass*, 2021 IL 125434, ¶ 21.  When a defendant is arrested without probable cause or a warrant based on probable cause, both the United States and Illinois constitutions are violated.  *Simmons*, 2020 IL App (1st) 170650, ¶ 49.

¶ 103   Here, Detective Ford testified at the suppression hearing that he issued an investigative

alert for defendant on May 30, 2014, based on other officers identifying defendant as the individual who fired a weapon, striking Howard. Specifically, Detective Ford testified that these other officers knew defendant. In the narrative portion of the investigative alert, Detective Ford wrote that defendant had been positively identified as one of the individuals who had discharged a weapon causing the death of Howard. Officer Luna testified that on June 10, 2014, there was an investigative alert for defendant with "probable cause to arrest" and that he arrested defendant pursuant to that investigative alert. Defendant does not argue on appeal that the officers did not have probable cause to arrest him. Rather, defendant argues that his arrest was unconstitutional as he was arrested pursuant to an investigative alert and not pursuant to an arrest warrant.

¶ 104    Defendant relies on the appellate court opinion in *People v. Bass*, 2019 IL App (1st) 160640, ¶¶ 62, 71, *aff'd in part and vacated in part*, 2021 IL 125434, ¶ 34. In *Bass*, the defendant was arrested pursuant to an investigative alert based on probable cause, as here, and a divided panel of the appellate court concluded that the defendant's motion to suppress should have been granted because arrests based solely on investigative alerts, even if the alert is based on probable cause, violate the Illinois Constitution. *Id.* ¶¶ 7, 42, 71. In April 2021, while this case was being briefed, our supreme court issued an opinion in *Bass*, in which it agreed with the appellate court that the defendant's motion to suppress should have been granted, but it reached that conclusion on narrower grounds, finding that the traffic stop at issue was unconstitutionally extended. *Bass*, 2021 IL 125434, ¶ 26. As the court decided the case on narrow grounds regarding the legality of the traffic stop, it did not address the constitutional issue regarding whether investigative alerts violate the Illinois Constitution, and it vacated the portions of the appellate opinion relating to investigatory alerts. *Id.* ¶¶ 29, 33; see *People v. Little*, 2021 IL App (1st) 181984, ¶ 63.

¶ 105   Thus, as our supreme court has vacated the portions of *Bass* regarding the constitutionality of investigative alerts, we will not follow those portions of the appellate court opinion.  Instead, we will follow other panels of this court that have concluded that investigative alerts do not violate the Illinois constitution.  See *People v. Braswell*, 2019 IL App (1st) 172810, ¶ 39; *Simmons*, 2020 IL App (1st) 170650, ¶ 64; *People v. Thornton*, 2020 IL App (1st) 170753, ¶¶ 45-50; *People v. Bahena*, 2020 IL App (1st) 180197, ¶ 63.  Accordingly, we are unpersuaded by defendant's argument that his arrest was unconstitutional because he was arrested pursuant to an investigative alert and not an arrest warrant.  The trial court did not err when it denied his motion to suppress.  Moreover, as the trial court observed in this case, regardless of the constitutionality of an arrest based on an investigative alert, defendant's arrest was supported by probable cause in that the officers who knew defendant had already identified him as the shooter by name from the video surveillance footage.  Thus, defendant's arrest did not run afoul of the Illinois Constitution.  See *Little*, 2021 IL App (1st) 181984, ¶ 64.

¶ 106   In the alternative, defendant contends that defense counsel was ineffective for failing to raise this argument in the motion.  However, based on our analysis above, the unargued issue that defendant's arrest pursuant to an investigative alert was unconstitutional was not meritorious.  See *People v. Gayden*, 2020 IL 123505, ¶ 28 ("In order to establish ineffective assistance based on counsel's failure to file a suppression motion, the defendant must demonstrate both that the unargued suppression motion was meritorious and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed.").  Counsel cannot be deemed ineffective if the motion would have been futile.  *People v. Givens*, 237 Ill. 2d 311, 331 (2010).  Accordingly, defendant's ineffective assistance of counsel argument as to defense counsel's failure to raise the constitutional issue in the motion to

suppress fails.

¶ 107                    Ineffective Assistance of Counsel – Jury Instruction

¶ 108   Defendant next asserts that he received ineffective assistance of counsel when his defense counsel failed to pursue a second-degree murder jury instruction.  Defendant maintains that the evidence was sufficient to instruct the jury on an imperfect self-defense theory of second-degree murder.  Defendant further maintains that because there is a reasonable probability that the jury would have accepted the theory of imperfect self-defense, defense counsel's failure to seek this instruction constituted ineffective assistance and this court should reverse his conviction and remand the matter for a new trial.

¶ 109   In response, the State asserts that defense counsel was not ineffective where his strategic decision not to seek the instruction was reasonable and where, even if such an instruction had been given, the outcome would not have changed.

¶ 110   A criminal defendant is guaranteed the right to the effective assistance of counsel by both the United States and Illinois Constitutions.  U.S. Const., amend. VI, XIV; Ill. Const. 1970, art. I, § 8.  Claims that counsel provided ineffective assistance are evaluated under the familiar two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which our supreme court adopted in *People v. Albanese*, 104 Ill. 2d 504 (1984).  To prevail on an ineffective-assistance-of-counsel claim, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance resulted in prejudice.  *Strickland*, 466 U.S. at 687-88; *People v. Johnson*, 2021 IL 126291, ¶ 52.

¶ 111   A defendant must satisfy both prongs of the *Strickland* test to prevail on a claim of ineffective assistance of counsel.  *People v. Flores*, 153 Ill. 2d 264, 283 (1992).  Reviewing courts measure counsel's performance by an objective standard of competence under prevailing

professional norms. *Spiller*, 2016 IL App (1st) 133389, ¶ 36. To establish deficient performance, defendant must overcome the strong presumption that the challenged action or inaction might have been the product of sound trial strategy. *Id.*

¶ 112 Conduct that would otherwise constitute first-degree murder instead constitutes second-degree murder when either of the two statutory mitigating circumstances are present. See 720 ILCS 5/9-2(a) (West 2014). The mitigating circumstance at issue in this case is what is generally referred to as "imperfect self-defense." *People v. Jeffries*, 164 Ill. 2d 104, 113 (1995); see *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 18. A conviction for second-degree murder based on the mitigating factor of imperfect self-defense is appropriate when "there is sufficient evidence that the defendant believed he was acting in self-defense, but that belief is objectively unreasonable." *Jeffries*, 164 Ill. 2d at 113; see also 720 ILCS 5/9-2(a)(2) (West 2014) (providing that a defendant is guilty of second-degree murder if, at the time of the killing, he believed circumstances were present that would have justified the killing based on self-defense had those circumstances actually been present).

¶ 113 A defendant is entitled to an instruction on second degree murder if there is some evidence in the record to support his claim that a mitigating circumstance is present. *People v. McDonald*, 2016 IL 118882, ¶ 25.

¶ 114 Defendant argues that his counsel was ineffective since the evidence at trial was sufficient for a finding of second-degree murder. Defendant points to his own testimony and videotaped interview wherein he repeatedly stated he was scared of Jones. Not only had Jones shot him twice in 2013, but Jones had threatened to kill him earlier in the day on May 29, 2014. Defendant testified that when he heard yelling outside of the 720 building after 5 p.m. on May 29, 2014, he knew it was Jones and acted out of fear when he exited the building and attempted

to shoot Jones.

¶ 115   Although defendant now argues that he unreasonably believed he was justified in firing his weapon at Jones in imperfect self-defense, the evidence at trial demonstrates otherwise.  To establish this affirmative defense, the defendant must present evidence supporting the elements of self-defense: (1) unlawful force was threatened against a person; (2) the person threatened was not the aggressor; (3) there was an imminent danger of harm; (4) the use of force was necessary; (5) the person actually and subjectively believed a danger existed requiring the use of the force applied; and (6) the person's belief was objectively reasonable.  *Gray*, 2017 IL 120958, ¶ 50.  If the defendant meets that burden, the burden of proof shifts to the State to prove beyond a reasonable doubt not only that the defendant committed first-degree murder, but also that he did not act in self-defense, by negating any of the elements of self-defense.  *Jeffries*, 164 Ill. 2d at 127-28.  If the State negates any one of these elements, the defendant's claim of self-defense must fail.  *People v. Olaska*, 2017 IL App (2d) 150567, ¶ 145.

¶ 116   Defendant here has failed to present some evidence to warrant a second-degree murder jury instruction.  While defendant testified that approximately 45 minutes before the shooting occurred Jones threatened to kill him, he did not testify that there was an immediate threat at the time the shooting occurred.  In fact, defendant testified that he walked out of the 720 building and immediately fired his loaded .22-caliber revolver at Jones' vehicle.  There was no time, at that moment, for Jones to have threatened defendant prior to defendant firing his weapon.  This evidence also demonstrates that defendant was the aggressor in this scenario.  Regarding an imminent danger of harm, defendant testified that he was on the roof at the time Jones drove in front of the 720 building and admitted that he was safe on the roof.  This testimony negates any imminent danger of harm.  Lastly, we observe that defendant failed to present any evidence that

the use of force was necessary—indeed, defendant admitted he fired his weapon first and there was no evidence that Jones was armed with a firearm. We further observe that the State demonstrated evidence of flight, and flight is circumstantial evidence from which a defendant's knowledge that he did not act in self-defense can be inferred and a self-defense theory can be refuted. *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 59.

¶ 117    In sum, the evidence at trial established that defendant was not in imminent danger and that he was the aggressor and therefore there was not some evidence of each of the elements of self-defense to warrant a second-degree murder jury instruction. Accordingly, defense counsel did not render ineffective assistance when he failed to request a second-degree murder instruction. See *People v. Hampton*, 2021 IL App (5th) 170341, ¶ 101 (finding a second-degree murder jury instruction was not appropriate where the evidence established that the defendant "easily could have driven away" if he believed the victim posed a danger, but instead he exited the vehicle and fired multiple shots at the victim).

¶ 118                              Prosecutorial Misconduct

¶ 119    Defendant next maintains that the State violated the trial court's pretrial ruling when it elicited improper other-crimes evidence, elicited irrelevant and improper gang evidence, and introduced evidence relating to defendant's prior contacts with police officers. Defendant asserts that the trial court indicated that it would allow the State to elicit evidence of the March 11, 2013, incident and the January 29, 2014, incident if defendant first opened the door in his testimony and that, as defendant did not open the door, such testimony was improper and prejudicial to him.

¶ 120    In response, the State argues that defendant forfeited these claims when he failed to raise them during trial and in a posttrial motion. Forfeiture aside, the State asserts that there was no

error when it was in full compliance with the trial court's pretrial rulings. The State notes that it never introduced any evidence of the March 11, 2013, incident and when evidence was introduced regarding the January 29, 2014, incident the testimony did not apprise the jury that this incident involved a murder or was gang related. The State further asserts that it did not seek to exclude gang evidence and, therefore, there was no bar on gang testimony. The State notes that defendant himself acknowledged he was in a gang in his interview with detectives, yet this interview was not objected to by defendant.

¶ 121   To preserve an issue for review, a party ordinarily must raise it at trial and in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); *People v. Thompson*, 238 Ill. 2d 598, 611-12 (2010). This requires that a defendant specifically object at trial and raise the specific issue again in the posttrial motion. *People v. Woods*, 214 Ill. 2d 455, 471 (2005). Failure to preserve an alleged error for review is a procedural default. *People v. Rivera*, 277 Ill. App. 3d 811, 818 (1996). As defendant did not properly preserve this issue for consideration on appeal, it is forfeited.

¶ 122   Defendant acknowledges that this issue was not properly preserved for appellate review, and requests that this court consider the issue under the plain-error doctrine. He argues both that the evidence was closely balanced and that he was denied a fair trial.

¶ 123   To establish plain error, a defendant must first establish that a clear or obvious error occurred (*Thompson*, 238 Ill. 2d at 613), and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error (*People v. Naylor*, 229 Ill. 2d 584, 593 (2008)) or that the error was sufficiently grave that it deprived defendant of a fair trial (*People v. Herron*, 215 Ill. 2d 167, 187 (2005)). The first step in a plain-error review generally is to determine whether the trial court committed error, and

the burden is on defendant to establish that an error occurred. *Thompson*, 238 Ill. 2d at 613.

¶ 124   We begin our analysis with the basic standards of review applicable to evidentiary issues. The admission of evidence is within the sound discretion of a trial court, and a reviewing court will not reverse the trial court absent a showing of an abuse of that discretion. *People v. Hall*, 195 Ill. 2d 1, 20-21 (2000). An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would agree with the position adopted by the trial court. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). Illinois courts have long recognized, as a matter of common law, that a trial court may exercise its discretion to exclude evidence, even when it is relevant, if its prejudicial effect substantially outweighs its probative value. *People v. Walker*, 211 Ill. 2d 317, 337 (2004).

¶ 125   Our review of the record reveals that no error occurred in the questioning of the State's witnesses during the State's case-in-chief. Prior to the trial, the State filed a motion to introduce other-crimes evidence. Specifically, those other crimes involved two incidents which occurred on March 11, 2013, and January 29, 2014. The trial court prohibited the State from eliciting the specific offenses that occurred on these dates from its witnesses. Regarding the March 11, 2013, date, the trial court ruled that general testimony regarding the fact defendant voluntarily went to the police station for questioning could come into evidence if defendant were to testify he was fearful of the police. Defendant, however, did not so testify and therefore no testimony was elicited regarding March 11, 2013.

¶ 126   As for the January 29, 2014, incident, the trial court allowed the State to elicit testimony establishing defendant was familiar with the 720 building, but expressly disallowed any reference to a murder taking place there on that date. The State elicited testimony from Giles, Officer Hoard, and Detective Sandoval regarding January 29, 2014. Giles, the building

maintenance man, testified that an incident occurred in apartment 301 on January 29, 2014, and he assisted the police in obtaining the video surveillance footage. Officer Hoard testified that he had been called to the 720 building on January 29, 2014, and observed defendant on the video surveillance footage that day. After Officer Hoard testified, the trial court issued a limiting instruction to the jury which advised the jury to consider any of defendant's conduct not involved in the indictment to be received on the issues of defendant's presence in the building and for identification only. Detective Sandoval testified he was assigned to investigate what occurred at the 720 building on January 29, 2014. During the course of his investigation he was able to view the video surveillance footage and identified defendant as appearing in that footage. In March of that year, Detective Sandoval interviewed defendant. Defendant acknowledged that he had been on the third floor of the 720 building on January 29, 2014. A review of this testimony reveals that the State did not exceed the bounds set by the trial court in questioning its witnesses regarding defendant's presence in the 720 building on January 29, 2014. No testimony was elicited regarding the type of investigation that was being conducted nor did anyone testify defendant was a suspect or had been arrested. When considered in conjunction with the trial court's limiting instruction, it is evident that the jury was aware that the State presented this testimony to establish defendant's familiarity with the third floor of the 720 building. Accordingly, we conclude no prejudicial error occurred. "Having found no error, there can be no plain error." *People v. Bannister*, 232 Ill. 2d 52, 79 (2008).

¶ 127   Defendant contends, however, that the State's witnesses improperly referenced "gangs" when testifying despite such a reference being highly prejudicial. Defendant asserts that the 17 references to "gangs" served to inflame the jury and infected their verdict.

¶ 128   In response, the State observes that there was no motion *in limine* prohibiting it from

referencing gangs, that defendant himself admitted he was a gang member in his interview with the detectives, and, regardless, the witnesses' testimony regarding their assignments to gang units was not so prejudicial as to require reversal.

¶ 129   Evidence of gang membership and gang-related activity is admissible where it is relevant to an issue in dispute, there is sufficient proof that membership is related to the charged offense, and its probative value is not substantially outweighed by its prejudicial effect. *People v. Johnson*, 208 Ill. 2d 53, 102 (2003).  In this case, however, we find that the State did not present any evidence that the shooting was gang related or that defendant was a gang member.

¶ 130   We find the issue raised here similar to that addressed by this court in *People v. Gales*, 248 Ill. App. 3d 204 (1993).  In *Gales*, the trial court ruled that the State could not introduce evidence of the gang affiliation of any witness, and the State indicated it did not intend to offer any such evidence during its case in chief. *Id.* at 227-29.  During trial, "[s]everal police officers introduced themselves as 'gang specialist' assigned to 'gang crimes south' with their assignment being 'gang suppression.' " *Id.* at 227.  The defendant noted on appeal that the word "gangs" was used more than 96 times during trial and argued that this use of the word indirectly implied that he was a gang member. *Id.*  This court pointed out that there was no testimony that any of the defendants were gang members, no testimony about gang activity in the area, and no evidence presented that the investigation was gang related. *Id.* at 228.  We noted that the trial court's pretrial ruling clearly barred testimony regarding gang affiliation, and found that the officers' testimony identifying themselves as "gang crimes specialists" did not violate that ruling or infer that the defendant was a gang member. *Id.* at 228-29.

¶ 131   The record reflects that Officer Kennedy testified that he was currently assigned to the Gang Investigations Division and does "a lot of workup in long-term investigations on violent

gangs across the city." However, when the offense at issue occurred in May 2014, he was not assigned to the Gang Investigations Division but was a plain-clothes officer in the 6th District. Officer Hoard testified that he was currently assigned to the "troubled buildings" unit of the Chicago Police Department and that his duties included working "drug and gang house enforcement." However, he was not working in the troubled buildings unit in May 2014. Officer Luna testified that on May 29, 2014, he was assigned to the Gang Investigations Unit. When asked by the State what other types of detectives exist, Detective Ford testified that there are detectives assigned to "fugitive apprehension, gangs." Detective Ford also testified regarding his investigation of this case that he requested "all his tactical and gang officers meet us in the gang office" to identify the individual in the video surveillance footage. Then, Detective Ford testified that Officer Kennedy identified defendant due to Officer Kennedy's previous contacts with defendant while performing his duties as a gang officer. Ford also explained that during the course of his investigation he spoke with at least 10 officers in various "gang and tactical units."

¶ 132 We agree with the State that the references made by the State's witnesses to gangs was not in violation of any motion *in limine* nor did the references prejudice defendant. First, we observe that defendant did not bring a motion *in limine* prohibiting the State from referencing gangs or addressing whether or not defendant was a member of a gang. Second, any reference to gang evidence the State made during the hearing on its motion involving other-crimes evidence was solely related to the other crimes and not to the May 29, 2014, shooting. For example, when asked by the trial court whether the murder in this case was related to the January 29, 2014, murder, the prosecutor responded, "They're probably both gang related, but I'm not looking to go there." The prosecutor further expressed that she was not seeking to offer the proof of other crimes to prove defendant's gang-related motive. Third, the trial court did not issue a ruling

related to gang evidence in this case. Fourth, when gang references were made during the trial it was primarily in regard to the officers' assignments and duties and not directly connected to defendant. See *Gales*, 248 Ill. App. 3d at 227. Fifth, the State's witnesses did not testify that defendant was in a gang or that the May 29, 2014, shooting was gang related. Accordingly, we find no prejudicial error occurred in this case. As no error occurred, there can be no plain error and defendant's claims on appeal fail. See *Bannister*, 232 Ill. 2d at 79.

¶ 133                                   One-Act, One-Crime

¶ 134   Lastly, defendant contends his mittimus, which reflects two convictions for first-degree murder, should be corrected to reflect one conviction and sentence for first-degree murder. The State agrees that defendant's mittimus should be corrected to reflect one conviction of intentional murder (720 ILCS 5/9-1(a)(1) (West 2014)).

¶ 135   Under the one-act, one-crime rule, multiple convictions may not be carved from the same physical act. *People v. Coats*, 2018 IL 121926, ¶ 11. When multiple convictions are erroneously imposed, surplus convictions must be vacated. See *In re Tyreke H.*, 2017 IL App (1st) 170406, ¶ 123. A one-act, one-crime claim is reviewable under the second prong of the plain-error rule. *Coats*, 2018 IL 121926, ¶ 10. We review this purely legal claim *de novo. Id.* ¶ 12.

¶ 136   Here, we agree with the parties that defendant's conviction for knowing murder (720 ILCS 5/9-1(a)(2) (West 2014)) must be vacated. See *In re Samantha V.*, 234 Ill. 2d 359, 379 (2009) (a sentence should be imposed on the offense that bears the more culpable mental state). Pursuant to the one-act, one-crime doctrine, multiple convictions are improper if they are "based on precisely the same act." *In re Angel P.*, 2014 IL App (1st) 121749, ¶ 66. In this instance, the two convictions for first-degree murder reflect defendant's actions towards a single victim. Accordingly, both convictions cannot stand and we vacate defendant's conviction for knowing

murder (720 ILCS 5/9-1(a)(2) (West 2014)).

¶ 137                                    CONCLUSION

¶ 138   For the reasons stated above, we vacate defendant's conviction for knowing murder (720

ILCS 5/9-1(a)(2) (West 2014)) pursuant to the one-act, one-crime rule but otherwise affirm the

judgment of the circuit court of Cook County.  The mittimus shall be corrected accordingly.

¶ 139   Affirmed in part, vacated in part.